LOUIS I. NASH, Appellant, *v.* GAY APPAREL CORPORATION, Respondent.

First Department, November 27, 1959.

*Joseph M. Callahan* of counsel (*Henry S. Miller,* attorney), for appellant.

*Raphael H. Weissman* of counsel (*Edward J. Mallin,* attorney), for respondent.

BERGAN, J. Decision on this appeal turns on the use of words in a written contract, words which may be read in one sense the way plaintiff reads them and in a literal sense the way defendant reads them. An evaluation must be made as a basis for a declaratory judgment of what was intended to be expressed when the words were set down, to be adduced both from the total contractual language and from the circumstances and practices of the parties when they entered into the formal writing.

Defendant corporation has 160 shares of Class A common stock outstanding; plaintiff was the owner of half of them; his brother was the owner of the other half. In March, 1956, plaintiff and the defendant corporation executed the written contract here in issue, pursuant to which the corporation agreed to purchase plaintiff's stock for $575,000.

Payment was to be made over a protracted period of time; $50,000 at the closing of the contract, the rest in quarter annual installments of $25,000, the first not due until 5 years, and the last due 12½ years after the closing. Defendant owns from 80 to 100 per cent of 60 subsidiaries which operate retail stores throughout the country and it fully controls all such subsidiaries.

The contract of sale contained a provision for the protection of plaintiff during the long period in which the purchase price was being paid. Both his stock and the stock of his brother were were placed in escrow to guarantee performance; but plaintiff retained no power as a stockholder in the control of the defendant or of its subsidiaries. He had by the terms of the instrument the right periodically to information concerning the business operations of defendant; the words in controversy bear upon the scope and area of plaintiff's right of access to this information.

The contract contains two separate provisions on this subject: (a) " [f]inancial statements as of January 31st and July 31st of each year shall be given to the Party of the Second Part [plaintiff] "; and (b) " Once in each calendar year, upon written request of the Party of the Second Part, an inspection of the books and records of the Party of the First Part may be made by him or by his designated representative."

The differences between the parties may be simply stated. Plaintiff contends that he is entitled on written request to

inspect the books and records of defendant's subsidiaries which are in defendant's possession and control at its office in New York and could readily be made available to plaintiff; defendant contends that inspection is literally limited to its own corporate books and records.

Defendant has had declaratory judgment in its favor after a trial of the issues. We are of opinion the words of the contract were intended by the parties to have a broader meaning and to include a right of inspection of the books and records of the subsidiaries in the possession and under control of the defendant.

Proof extrinsic to the instrument was taken on the trial as to the meaning understood by the parties of the expression " books and records of the Party of the First Part "; and we think ambiguity in those words, as these parties used them, is sufficiently demonstrated to justify the enlightenment of extrinsic evidence.

Written words may, as POUND, J., noted in *Heller* v. *Pope* (250 N. Y. 132, 135), " have more than one meaning "; and while parol will not be allowed to change " plain meanings " it may be useful to illuminate doubtful ones.

Uncertain semantic meaning may be inherent intrinsically in the way the words are used; or in their relationship to the entire writing; or from the practices and usages of the parties writing them down. Interpretative assistance is sought first from context of other written words; but unresolved doubts necessarily must then be settled by extrinsic proof.

This is the rule where the " language alone " is of " doubtful import " (*Morris* v. *Sickly,* 133 N. Y. 456, 459). In every interpretation of written language the process involves " association between words and external objects " (KELLOGG, J. in *Matter of Smith,* 254 N. Y. 283, 289, approving Wigmore's statement in Evidence, § 2470, subd. 3). The complete instrument with all its contextual meanings in " the light of the obligation as a whole " is the main guide to construction (*Atwater & Co.* v. *Panama R. R. Co.,* 246 N. Y. 519, 524).

There are, of course, situations where an inspection of " books and records of " a corporation would admit no reasonable argument for ambiguity; a literal reading of the words would be good enough. But it is easy to suppose other situations of interrelated interest and management, or of fiscal and accounting practices actually followed, where books and records " of " a party might be well understood to mean records of controlled or related corporate instrumentalities relevant and important to the purpose of the inspection.

Here we regard the defendant's subsidiaries to have been intended by the parties to be placed within the area of plaintiff's right to inspection; and we are of opinion that this intention is fairly to be deduced from the contextual words of the instrument and the course of practice in defendant's business.

We address ourselves first to the internal evidences of intention found within the instrument itself. The paragraph of the contract immediately following the provision for financial statements and for inspection is as follows: '' The Party of the First Part and/or its subsidiary or affiliated corporations shall make no loans or advances, directly or indirectly, to any officer, director or stockholder of the Party of the First Part exceeding, in the aggregate $25,000.00 in any one year. Nothing herein, however, shall be construed to restrict or modify the course of dealings heretofore in existence between the Party of the First Part and its subsidiary or affiliated corporations.''

This restriction on the freedom of defendant's financial activity was for plaintiff's benefit and it included an undertaking by the defendant to control financial transactions of its subsidiaries in particular and specified ways for the protection of plaintiff's interest against a diminished capacity of the defendant to sustain a long-protracted undertaking to pay for plaintiff's stock.

It is clear that plaintiff was not only entitled by the contract to have defendant control its subsidiaries in the specified ways; he was entitled to satisfy himself by sufficient inspection of the books and records in the possession of defendant that what was agreed to be done was done.

Without access to the books and records of '' its subsidiary or affiliate corporations '' it would not be possible for the plaintiff to know, as it seems to have been the intention of the parties that he was entitled to know, whether loans or advances were being made to persons connected with the defendant corporation exceeding $25,000 in one year.

It is apparent that in some contingencies such loans or advances might properly exceed this amount. One such contingency would be if it were consistent with '' the course of dealings heretofore in existence '' between the defendant corporation and its subsidiaries. To be advised whether the contract was being honored by defendant in this respect it would necessarily have to be known whether the financial transactions between the defendant's officers or stockholders and the subsidiaries were in accord with '' the course of dealings '' that had theretofore been followed in respect of the subsidiaries.

No one has suggested how plaintiff might possibly be advised from the books and records of the defendant alone whether loans or advances had been made, for example, by one of the 60 subsidiaries to an officer of the defendant in excess of $25,000; and if it was made, whether it was consistent, or not consistent, with " the course of dealings " to which the defendant and such subsidiary had been accustomed.

When the parties used, in the next succeeding paragraph, the term vital in this controversy " inspection of the books and records of " the defendant as a means available to the plaintiff to assure himself the contract was being performed, they necessarily had in mind books possessed by or controlled by the defendant corporation which would reflect fully financial transactions between the subsidiaries and the defendant's corporate officers.

Moreover, the defendant corporation undertook to see to it that its subsidiaries and affiliated corporations would not issue any new preferred liens or securities unless the proceeds were applied to properties of the defendant or its subsidiaries, or went into their " operating capital ". It could scarcely be argued that compliance with this provision could intelligently be checked without full access to books of the subsidiaries and we read the agreement with its contextual language as suggesting that the parties intended plaintiff have access to such books and records.

Indeed, it is difficult to justify within the spirit of the contract the refusal by defendant to allow plaintiff fully to examine the books in its possession except on arbitrary grounds; and the refusal was not justified or sustained on a reasonable basis at the time inspection was requested; plaintiff's accountants were told merely they could not see the subsidiaries' records which defendant had in its office. Inspection here sought is not shown to be unduly burdensome or disturbing to defendant; and its exercise as a protective annual right, given to assure conformity with a long-term agreement to pay substantial sums, is something more than an expedition in satisfaction of curiosity.

This interpretation based on internal examination of the document itself is strengthened by the collateral proof. It seems clear that the parties were accustomed to treating the defendant and its subsidiaries in a unitary sense. The financial statements prepared by the defendant in the usual conduct of its business were consolidated statements which reflected the over-all business of the subsidiaries as well as the defendant.

When the parties used the expression " [f]inancial statements as of January 31st and July 31st of each year shall be given "

they were not thinking merely of financial statements of the defendant alone, but of the defendant and its subsidiaries taken together. Not only is that the way the contract was actually performed in the first semi-annual statements given, and, hence, practically construed by the parties; but, what is of far greater importance on the true intention with which the parties used the term, the defendant's treasurer testified on the trial that it was the uniform past practice of the defendant to issue "only consolidated" statements and that this was what the defendant had been "habitually issuing".

It thus becomes manifest that the parties meant by "financial statements" information which would reflect the business of the subsidiaries and not narrowly the business of the defendant as a separate entity; and it readily follows that in the very next sentence, closely related to the same subject and in the same paragraph, they meant "books and records of the Party of the First Part" to include those books and records which would adequately reflect and support, or disprove, the material shown in the financial statements.

Read together, the sentence dealing with financial statements which were to be given automatically twice a year, and the sentence providing for the inspection of the books and records which was to be afforded annually "upon the written request" of the plaintiff, seem closely integrated to mean that if the plaintiff were satisfied with the financial statements given semi-annually he would do nothing more; but if he wanted to verify them he would make the written demand which would give him the books and records. The parties seem to have been dealing with two aspects of the same financial information.

On the trial the court took proof, offered by defendant, of a former attorney for the plaintiff, who represented him at the signing of the contract but who then no longer was his lawyer; he gave testimony suggesting that what he thought the parties had in mind was an examination of the books of the defendant alone and not its subsidiaries' books. But he added that the reason why no express reference was made in the written agreement to the books of the subsidiaries was "because they had no effect on my mind insofar as the protection of my client's interest was concerned". What a lawyer has in his mind about what protection may be required may be quite a different thing from what the parties understood they were to do under their agreement.

When the examination of the books was refused by defendant, however, this lawyer still representing plaintiff, held quite a different opinion as to what he then thought had been intended.

352

In a letter to the attorney for defendant on December 6, 1957 he quoted the language here in issue and made the flat statement that the books and records of the subsidiaries "are part of such data belonging to" defendant and asserting they were to be made available within the contract.

We think on the whole record plaintiff is entitled to a declaratory judgment favorable to his right of inspection of the records of the subsidiaries within the terms of the contract.

The judgment should be reversed on the law and the facts, and judgment for the plaintiff directed, with costs.

M. M. FRANK and VALENTE, JJ. (dissenting). We must dissent and vote to affirm, substantially for the reasons set forth in the opinion of the learned Special Referee. However, in view of the majority opinion, it is appropriate to express an additional thought.

From the record before us, it is evident that no charge is made nor is there a scintilla of proof that the plaintiff's security has been endangered or impaired in the slightest degree. Moreover, there is no indication from any single entry in the statement furnished to the plaintiff that gives rise to a suspicion of any impairment of the value of the security. In the absence of such a showing, we should not strain to extend the language of the contract to embrace the records of the subsidiary corporation. When the plaintiff sold his stock, he retained no further interest in the corporate business. The provision for the examination of the books of the defendant was intended solely for the purpose of enabling him to determine whether the value of the stock he conveyed was impaired so as to endanger his collection of the balance of the purchase price. The Special Referee was quite correct in his conclusion that the plaintiff is not entitled to a "fishing expedition" on this record.

BOTEIN, P. J., and RABIN, J., concur with BERGAN, J.; M. M. FRANK and VALENTE, JJ., dissent and vote to affirm in opinion.

Judgment reversed on the law and on the facts, and judgment for the plaintiff directed, with costs.

Settle order.