In the Matter of the Estate of WILHELMINA FRIEDMAN, Deceased. ELIZABETH BECQUE, as Administratrix of the Estate of WILHELMINA FRIEDMAN, Deceased, Respondent; CHARLES EGAN, Appellant.

Second Department, August 7, 1978

72

### APPEARANCES OF COUNSEL

*Lawrence Levine (Israel Machtey* of counsel), for appellant.

*Strook & Strook & Lavan (Sybil H. Pollet, Franklin Feldman, Gary J. Greenberg* and *Roy Langbord* of counsel), for respondent.

*Shearman & Sterling* for Volunteer Lawyers for the Arts, *amicus curiae.*

### OPINION OF THE COURT

MARGETT, J.

Arnold Friedman was an important American artist who derived his style from Impressionism, but who expanded and transcended that idiom with his own unique personal style.[1] Friedman's biography reads like the classic (some might say stereotyped) tale of a struggling artist whose work was never

---

[1]. Impressionism was clearly the "dominant influence on his work", and Friedman himself wrote wryly on the back of one of his pictures: "Psst! Psst! Don't look now, mister, but your impressionism is showing.—Thanks" (Schack, The Ordeal of Arnold Friedman, Painter, Commentary, January, 1950, pp 40-46). Friedman "create[d] an Impressionist vein of his own" *(id,* p 42), and "attempt[ed] to carry Impressionism in the direction of abstraction while refusing, in the end, to go over into abstraction" (Kramer, *New York Times,* March 23, 1969). "[H]e carried his work to a plateau of feeling far removed from the orthodoxies of [Impressionism]" *(id).*

appreciated in financial terms until well after his death. Born in 1874, Friedman grew up on the east side of Manhattan. His father—who had emigrated from Hungary with his wife—died in 1878, leaving his mother with three other small children to support. In his early teens Friedman became a wage earner, working at the Produce Exchange. At the age of 17 he was virtually the sole support of his family and began to work for the New York Post Office.

At age 32, while still employed by the Post Office, Friedman began to study art at the Art Students League in New York. In 1908, after three years of evenings at the League, he took a leave of absence from his job and traveled to Paris, where he lived for six months. While there he met his wife. Upon his return to New York, he continued to work six days a week, as many as 10 hours a day, at the New York Post Office. Two or three years after his marriage, with $25 coming in every week, he purchased a house in then rural Corona, Queens, complete with an attic studio. He worked there as time permitted. His daily routine of travel to and from the New York Post Office went on until his retirement on a meager pension in the 1930's.[2]

In terms of quantity, his production was limited by his job and by his responsibilities to his wife and four children. Friedman was 42 years old before he participated in his first group show and 52 before he had his first one-man show. Although a number of his paintings were sold to collectors and museums during his lifetime, his only assets when he died intestate in 1946 consisted of his work. Today, Friedman's legacy of over 300 works of art is worth approximately a half-million dollars.[3]

This appeal involves a dispute over the ownership of that legacy. The dispute is between Elizabeth Becque, Friedman's daughter and the administratrix of his widow's estate, and Charles Egan, an art dealer. The origin of this controversy is an agreement entered into in May, 1963 between the artist's widow, Renee (Wilhelmina) Friedman, and Charles Egan, "d/

---

2. The foregoing biographical material is drawn largely from an excellent article, The Ordeal of Arnold Friedman, Painter, by William Schack, in the January, 1950 issue of *Commentary*. An article by Thomas B. Hess in the February, 1950 issue of *Art News* (pp 25-27, 59-60), Friedman's Tragedy and Triumph, also supplied a good deal of the material used.

3. This value was conceded by appellant's counsel at the hearing before the Surrogate.

b/a EGAN GALLERY". The agreement recites that Renee's children have "duly assigned to * * * [her] all of their right, title and interest in and to the estate of their late father Arnold Friedman"; that Renee "is now the sole owner of the unsold works of the late Arnold Friedman"; that "Egan, who is conducting an art gallery at 313 E. 79th Street, New York, N.Y. was a friend and admirer of the late Arnold Friedman"; and that "Renee wishes to have her late husband's works properly distributed in the art world". It is then agreed that "Renee * * * sells, transferrs [sic] and assigns over to Charles Egan all of the works of the late Arnold Friedman now in her possession * * * absolutely and forever." The parties further agreed to make an inventory of the collection. The consideration for this "sale, transfer and assignment" is as follows: "Egan agrees to accept the said works and properly prepare them for sale and exhibition, to put forth his best efforts to sell said works at prices which will be consonant with the merit of said works, and to pay to Renee, from time to time as said works are sold and payment therefor received, one half of the total received by him in the sale of any and all of the said works, it being understood that Renee's share of the proceeds of such sale is not to be diminished in any manner by expenses or charges of any kind." However, the agreement further provided that Renee "shall have no voice in determining the manner of sale or exhibition * * * or the prices at which * * * [the paintings] will be sold". It is recited that "having parted with title to said works, Renee's interest is limited to the receipt of one half of the proceeds from the sale thereof." This "agreement" was prepared by Egan's lawyer.

Mrs. Friedman could not afford her own lawyer. She was about 75 years of age at the time. Although she had been employed since the 1950's doing light housework in exchange for room and board, she received no monetary compensation. Mrs. Friedman had been "completely devoted" during her entire life to giving her late "husband an opportunity to paint and she believed very much in the quality of his paintings." She wanted to see her husband's work exhibited and sold, but the bulk of the collection had been in the basement of a gallery which was closed or in the process of closing. In late 1961 or early 1962, Mrs. Friedman approached Egan, an experienced art dealer who had known her husband since 1939 or 1940. According to Egan, Mrs. Friedman wanted to "give * * * [him] the work with the idea that * * * [he] would

take care of it". Egan did in fact take possession of the collection and he sold a small oil painting—a still-life—in 1962 for $300. He remitted $150 to Mrs. Friedman, since they "were on a fifty-fifty basis."

The following year, Mrs. Friedman and Egan went to the office of Egan's attorney, Samuel Duker, to see about having a written agreement drafted. At that meeting, it "came out" that Arnold Friedman had died intestate and Mr. Duker suggested to Mrs. Friedman that she have an attorney draw up assignments of her children's interests in the paintings. Duker testified that Mrs. Friedman told him she could not afford a lawyer and that he thereupon drafted such assignments for her. He gave these documents to Mrs. Friedman and told both her and Egan that they should notify him when the assignments were signed; he would then draft the "agreement" that they sought.[4]

Duker was subsequently notified by Egan that the assignments had been executed and he proceeded to draft the contract. When Mrs. Friedman and Egan arrived at his office for the execution of the contract, Duker "went over the agreement, word for word, and * * * [he] explained [it] to her and * * * [he] cleared up some misconceptions that she had about it". Duker testified that "at the end of the session * * * [he] said" to Mrs. Friedman: "Look, I'm Charlie's lawyer and, of course, he will pay me but I would like to have a picture and, in view of the fact that I drew this agreement—this assignment—and I had to go through this agreement and explain it to you word by word, would you mind if I picked out a small picture?" Mrs. Friedman gave Duker two paintings as a fee for his services.

For the next 14 years, Egan maintained exclusive custody of the Friedman collection.[5] During that period he held only one Arnold Friedman exhibition—in 1969. No sales resulted from that exhibition. According to petitioner, Elizabeth Becque,

---

4. Mr. Duker testified that he urged Mrs. Friedman to "get a lawyer because it makes it more difficult for one lawyer to handle a matter where there is only one lawyer in the picture and you have to be on guard to explain everything to the other side." However, "[s]he said she couldn't afford it."

5. The decree appealed from, dated August 16, 1977, directs Egan to deliver the collection to the estate by September 15, 1977. Egan sought a stay of enforcement (CPLR 5519, subd [a], par 4) pending the outcome of this appeal, but his motion was withdrawn after the parties stipulated that the collection should be held in joint custody at a room in the Morgan Manhattan warehouse until this court determines the appeal.

Egan failed to maintain any contact with Mrs. Friedman during the year immediately following the exhibition. Mrs. Becque testified that in 1970, in her mother's presence, she telephoned Mr. Egan to inquire as to his efforts to promote the paintings. Mrs. Becque stated that she mentioned her mother's need for money at the time. Mr. Egan allegedly told her that he was negotiating with a museum and that she should be patient. Mrs. Becque testified that Egan then said: "Look. You can have the paintings and see what you can do." Before she could respond, Egan added: "But, look, let's wait for the first of the year and we'll have an exhibition and see what happens then."

No exhibition was held in 1971, or thereafter. On the contrary, Egan closed his gallery in 1971 and began operating out of his apartment as a private dealer. Those Friedman works which were not in storage were hung on his apartment walls or stacked in a small room used as an office.

According to Elizabeth Becque, nothing was heard from Egan after her 1970 call, and she phoned him again in 1971 to ask about his promotional efforts. He allegedly repeated that he was still negotiating with museums and that if Mrs. Becque "thought * * * [she] could do better" she should "[t]ake the paintings and see what you can do."

In 1974 Mr. Egan did sell one painting to a noted collector for $1,000. Mrs. Friedman received a remittance of $500 on this sale. The sale price of $1,000 was considerably lower than the $3,000 to $15,000 range of prices at the 1969 exhibition. Mr. Egan explained at the trial that he wanted the collector "to buy a whole lot of * * * [Friedman's work] and wanted to make a very low price for him * * * but he * * * liked [only] one painting".

In 1974 or 1975 Mrs. Friedman entered a nursing home;[6] she died there on March 31, 1976. Shortly after her death, her estate demanded that Egan return the Arnold Friedman paintings (and memorabilia consisting of letters, etc.) in his possession. When Egan refused, the instant proceeding, pursuant to SCPA 2103, was commenced.

At the hearing before the Surrogate, three expert witnesses testified for petitioner as to the regular method of dealing

6. Irmgard Bartinieff, the lady with whom Mrs. Friedman had lived since the 1950's, testified that Mrs. Friedman left her home in about 1974. Petitioner states in her brief that her mother left Mrs. Bartinieff's household in early 1975.

("usage of trade") between artists and art dealers. Virginia Zabriskie, an art dealer who has operated the Zabriskie Gallery in New York City for 22 years (and who also operates a gallery in Paris), testified that dealers generally take paintings on consignment or purchase them outright. In the former case, the consignment would normally be for two years because artists usually want to be shown at least every two years. Estates would consign paintings for a longer period of time and might be exhibited every three years. The longest consignment she had ever handled was five years, and she has never heard of a consignment lasting 14 years or more. When a dealer purchases paintings outright, the consideration is an "[a]bsolutely fixed sum" of money payable "[t]hen and there" or "over a period of time". The contract under consideration at bar is not customary in the art field because *"[t]here is nothing in it for the artist"* (Emphasis supplied). No objections were taken to any of this testimony.

Clement Greenberg, a gentleman who has been called by some the leading American art critic, testified that he has served as executor or trustee for the estates of two artists. Over objection he testified that the agreements made by him in such fiduciary capacity were consignments, where the estate controlled the prices in consultation with the dealer. The estates would control or be consulted with respect to every decision the dealer made once a price had been fixed, aside from the "routine" ones involved in selling. On cross-examination, Mr. Greenberg elaborated. In terming the instant contract "a preposterous agreement", he observed: "No provision is made for the valuation or appraising of the works of art. No provision is made to insure that a decent price be obtained in the sale of these pictures. It is left to the one to whom the title passes to sell a Thousand Dollar picture for Five Hundred should he be in need of money * * * There is * * * no control over the person who received the title * * * He is left all alone with his judgment and his own interests."

Gilbert Edelson, an attorney specializing in art law who has practiced for 22 years, testified over objection that the normal relationship between artist and dealer is that of principal and agent. The artist consigns art work to the dealer and, when the art work is sold, the dealer gets a commission. The dealer accounts periodically to the artist. The dealer not only exhibits the artist periodically—he promotes the artist's reputation as well. Promotion is accomplished by trying to interest

museum curators in getting the works into museums, by trying to interest critics in writing articles and by trying to interest scholars in doing research. Some dealers have subsidized books on artists. In addition, catalogs are published in conjunction with, or even without, exhibitions. Many dealers will commission scholars, critics and art historians to write introductions to those catalogs. Exhibits are held every one to three years depending upon the quantity of work available.

On cross-examination, Mr. Edelson stated that the contract under consideration has elements of both a sale and a consignment. "This looks more to me at first glance like a consignment agreement because the works are going to be sold, the commission retained, and the proceeds paid which I think is the essence of the normal consignment agreement in the art world." However, he acknowledged that title never passes in a consignment.

Mr. Egan sought to introduce the testimony of Samuel Duker, the attorney who had prepared the contract. After brief testimony about Mr. Duker's background and about work he had done for Mr. Egan, counsel asked whether there came a time when Duker met Mrs. Friedman. An objection was taken to any testimony by Duker with respect to transactions concerning Mrs. Friedman. A *voir dire* followed, during which Duker testified generally with respect to his role in the execution of the subject contract. Following this *voir dire* the Surrogate granted a motion to exclude Duker's testimony with respect to the Egan-Friedman "agreement" on the ground that the attorney-client privilege had not been waived.

Following the luncheon recess, the Surrogate acknowledged that there was substantial authority for the lack of confidentiality where an attorney has been consulted by two or more persons in regard to a matter of common interest and where a controversy arises between such parties or their representatives. Nevertheless, the Surrogate adhered to his position on the ground of the inability of a party to a proceeding to prepare properly for cross-examination or to attempt to rebut the testimony of an attorney who represents both sides. In the words of the Surrogate, his ruling was "based on a strong feeling of equity and fairness to both sides", since "there is no way * * * [that] petitioner can attempt to meet the challenge of the testimony of a man who was in that room with Mr. Egan."

In an opinion dated August 1, 1977, Surrogate LAURINO

reasoned that although the "subject contract speaks in terms of an absolute conveyance of title * * * [Egan's] duties thereunder were fiduciary in nature with complete accountability for proceeds of sale to the decedent". *(Matter of Friedman,* 91 Misc 2d 201, 204.) This "patent inconsistency" could only be resolved by resort to the acts of the parties and by the application of custom and usage. In reviewing the evidence adduced with respect to those standards, the Surrogate concluded (p 205) that the contract was "a consignment arrangement".

The Surrogate noted that Egan has consistently acted, by his own testimony, as the "agent" for the decedent, collecting "sales commissions" on the two works of art that he did sell. Furthermore, the Surrogate credited petitioner's testimony that Egan had told her (p 204), " 'Look. You can have the paintings back and see what you can do' ". The court concluded that these were not the words of a man who has full title and interest in the paintings.

On the issue of custom and usage, the Surrogate credited the expert testimony to the effect that "with the rare exception of an outright sale for a sum certain * * * the common practice in the trade is consignment of art works from artist to dealer for a specified period of time, normally 2 to 5 years." (91 Misc 2d 205.) The court also took note of subdivision 1 of section 219-a of the General Business Law (enacted as section 220 in 1966 [L 1966, ch 984]), which provides that "whenever an artist delivers * * * a work of fine art of his own creation to an art dealer for the purpose of exhibition and/or sale on a commission, fee or other basis of compensation, the delivery to and acceptance thereof by the art dealer is deemed to be 'on consignment', and (i) such art dealer shall thereafter * * * be deemed to be the agent of such artist." While recognizing that this statute had been enacted subsequent to the date of the contract at issue, the court took note (p 205) of authority for the proposition that the statute had been enacted " 'to clarify the inherently fiduciary character of the "consignment arrangement" in the artist-art dealer relationship' which had existed through custom and usage prior to the enactment of * * * [the] statute" (citing Memorandum of the State Department of Law, 2 McKinney's Session Laws of NY, 1969, pp 2412-2413).[7]

---

7. This memorandum, which was submitted in connection with further legislation in 1969 which strengthened the 1966 law, refers back to the "aim" of the original

Accordingly, the Surrogate held (p 205) that the 1963 contract was "a consignment agreement which terminated on the date of death of decedent principal." He directed, *inter alia,* that "all the art works of the late Arnold Friedman presently in the possession of [Egan] * * * be turned over to petitioner". The resulting decree, dated August 16, 1977, is appealed by Egan. We affirm.

Appellant contends that the contract at issue is unambiguous and that it was error for the Surrogate to admit evidence of "custom and usage" or to credit testimony as to the conduct of the parties in his construction of the "agreement". Alternatively, it is argued that it was error for the court to exclude the testimony of Samuel Duker, the attorney who drafted the contract, with respect to the meeting at which the contract was executed.

"It is the rare writing that requires no interpretation" *(Bensons Plaza v Great Atlantic & Pacific Tea Co.,* 44 NY2d 791, 792-793). The contract before us is not that rare writing. Although the separate clauses of the "agreement" seem internally unambiguous, they diverge into inconsistency when the contract is read as a whole.

■ It is a fundamental canon of construction that a "contract must be read as a whole in order to determine its purpose and intent, and that single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part" *(Eighth Ave. Coach Corp. v City of New York,* 286 NY 84, 88). "The complete instrument with all its contextual meanings in 'the light of the obligation as a whole' is the main guide to construction" *(Nash v Gay Apparel Corp.,* 9 AD2d 345, 348). "Form should not prevail over substance and a sensible meaning of words should be sought" *(Atwater & Co. v Panama R. R. Co.,* 246 NY 519, 524; see, also, *City of New York v Pennsylvania R. R. Co.,* 37 NY2d 298, 300).

■ At bar, the Surrogate correctly concluded that there is a "patent inconsistency" between the language of absolute sale and the alleged purchaser's obligations thereunder, which are "fiduciary in nature with complete accountability for proceeds of sale to the decedent". We would agree with the opinion of

legislation. We note that the 1969 legislation (L 1969, ch 321), *inter alia,* brings a deceased artist's heirs or personal representatives under the protective umbrella of the section.

one of petitioner's experts, that the contract has both the elements of a sale and the elements of a consignment. Accordingly, the Surrogate properly considered extrinsic evidence with respect to the intent of the parties and the purpose of the "agreement".

On the basis of the evidence received, the Surrogate's characterization of this contract as a consignment was the correct one. There was overwhelming evidence, uncontradicted by appellant, that consignments of art—not sales—are the prevalent business arrangement between artists, or their estates, and art dealers. This evidence is, of course, buttressed by the 1966 enactment of legislation which "deem[s]" an artist's delivery of fine art to a dealer "to be 'on consignment'" (General Business Law, § 219-a). As noted by the Surrogate, that legislation was intended "to clarify the *inherently* fiduciary character of the 'consignment arrangement' in the artist-art dealer relationship" (see Memorandum of the State Department of Law, 2 McKinney's Session Laws of NY, 1969, p 2413). The expert testimony at the hearing further established that when an outright sale from an artist to an art dealer occurs, the consideration paid is customarily an absolute sum of money. In addition, appellant's statements to petitioner, in 1970 and 1971, to the effect that she should take the paintings if she thought she could do a better job of selling them, are consistent with an understanding that he had the paintings on consignment. Those words would not be spoken by one who owned the paintings.

Well-established tenets of contract construction also support the Surrogate's conclusion. "[P]arties to an agreement are presumed to act sensibly * * * and an interpretation that produces an absurdly harsh result is to be avoided" *(River View Assoc. v Sheraton Corp. of Amer.,* 33 AD2d 187, 190). Since there exists, in every contract, an implied covenant of good faith and fair dealing, the courts may take into consideration the fact that one construction would make the contract unreasonable. Thus, courts "will endeavor to give the construction most equitable to both parties instead of one which will give one of the parties an unfair or unreasonable advantage over the other" *(Rush v Rush,* 19 AD2d 846). Furthermore, it is a "basic principle of contract law that a written document is to be construed against the party who prepared it where there are ambiguous or contradictory provisions" *(Gillette v Heinrich Motors,* 55 AD2d 841).

■ These standards uniformly point toward the interpretation of this "agreement" as a consignment. The harshness and inequity of this contract if viewed as a sale will be dealt with at length later in this opinion. Suffice it to say at this point that if this be viewed as a sale, the "consideration" given by appellant is rather indefinite. He must use his "best efforts" to sell the paintings and Mrs. Friedman is to receive 50% of the gross receipts. What if Egan had died prior to Mrs. Friedman? Would his estate be obliged to attempt to sell the paintings and to remit half the proceeds to Mrs. Friedman? If viewed as a sale under the circumstances at bar, must Egan continue to use his "best efforts" to sell and must he pay Mrs. Friedman's estate 50% of the total received by him? It would appear that the workable alternatives would be (a) to construe the "consideration" clause as providing consideration only until one of the parties died, or (b) to construe the "agreement" as a consignment, with the accompanying principal-agent relationship which would terminate upon the death of either. The former alternative could result in a situation where the "transferor" received nothing in the way of financial benefit even though such financial benefit was plainly contemplated. The latter alternative would be more equitable to both parties and would substantially avoid the absurdly harsh result that one could "sell" more than 300 paintings with the possibility of getting nothing in return.[8]

■ Were it not for the exclusion of Samuel Duker's testimony, we would have no difficulty in affirming the decree upon the Surrogate's reasoning. However, despite the fact that Duker's credibility might be subject to the greatest degree of suspicion,[9] his testimony was both competent and germane

8. We reject a third possible alternative—that of deeming that the contract creates an agency coupled with an interest—as unworkable and well beyond the contemplation of the parties. Since neither the death of principal nor agent terminates an agency coupled with an interest (1 Mechem, Agency [2d ed], §§ 655, 672), the adoption of that alternative could lead to the potentially absurd result of one estate using its "best efforts" to promote the sale of these paintings for the other estate ad infinitum. Furthermore, the recitations in the contract (e.g., that "Egan, who is conducting an art gallery at 313 E. 79th Street, New York, N.Y., was a friend and admirer of the late Arnold Friedman") indicate that the parties contemplated that Egan would *personally* represent the Friedman collection. In all probability, the parties contemplated that all the paintings would be sold within their lifetimes.

9. It is a fair assumption that independent counsel retained by Mrs. Friedman would have strongly advised against her entering into the subject "agreement". In view of the fact that Mr. Duker testified that he explained the "agreement" to Mrs. Friedman "word for word," and that he "cleared up some misconceptions that she

with respect to the intent of the parties. No attorney-client privilege could be invoked to exclude his testimony since "[i]f two or more persons consult an attorney in regard to a matter of common interest * * * nothing that is said by the parties or the attorney is deemed confidential, in an action arising subsequently thereto between the parties or their personal representatives" (Richardson, Evidence [10th ed], § 413, and cases cited therein). Furthermore, in construing this ambiguous contract, all evidence relevant to its execution should have been held admissible.

■ Having said that, we hold this error to be harmless. To the extent that the "agreement" purports to transfer ownership of the paintings to Egan, it is unconscionable on its face.

The doctrine of unconscionability has been discussed by the courts and the commentators at great length (see, e.g., *Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises,* 58 AD2d 482; *Blake v Biscardi,* 62 AD2d 975; *Henningsen v Bloomfield Motors,* 32 NJ 358; *Williams v Walker-Thomas Furniture Co.,* 350 F2d 445; 14 Williston, Contracts [3d ed], § 1632; Eddy, On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719[2], 65 Cal L Rev 28) and we therefore limit our observations on the subject. The doctrine appears in section 2-302 of the Uniform Commercial Code (which became effective *after* the instant contract was executed [L 1962, ch 553, eff Sept. 27, 1964]), but the conclusion is inescapable that the Uniform Commercial Code simply codified the doctrine, which was used by the common-law courts to invalidate contracts under certain circumstances *(Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises, supra,* p 488; *Triple D & E v Van Buren,* 72 Misc 2d 569, 577, affd *sub nom. D & E Ind. Catering v Antinozzi,* 42 AD2d 840). The classic definition was a broad one. An unconscionable contract was one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other" *(Earl of Chesterfield v Janssen,* 2 Ves Sen 125, 155 [28 Eng Rep Reprint 82, 100]; cf. *Hume v United States,* 132 US

---

had about it", there would have been a definite motive for Mr. Duker to testify that Mrs. Friedman wanted Egan to own the paintings. Otherwise, because of the language suggesting an absolute conveyance of title, Mr. Duker's claim of full disclosure would have been untrue. Conversely, Mr. Duker could not be expected to testify that a consignment was intended, since such a poorly drafted "consignment agreement" would border on malpractice. In short, Mr. Duker's testimony might well be influenced by his own role in this transaction.

406, 411). A contractual clause would not be enforced where it was "so monstrous and extravagant that it would be a reproach to the administration of justice to countenance or uphold it" *(Greer v Tweed,* 13 Abb Prac [NS] 427, 429).

■ ■ The concept of unconscionability must necessarily be applied in a flexible manner depending upon all the facts and circumstances of a particular case. The courts have identified various elements of the unconscionable contract that may be characterized as substantive and procedural. Substantive elements of unconscionability appear in the content of the contract per se; procedural elements must be identified by resort to evidence of the contract formation process *(Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises,* 58 AD2d 482, 489, n 4, *supra;* see, also, *Nu Dimensions Figure Salons v Becerra,* 73 Misc 2d 140, 143). Inflated prices (i.e., grossly inadequate consideration given by the seller), unfair disclaimers of warranty and termination clauses have been deemed substantively unconscionable *(Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises, supra,* p 489, n 4). High pressure sales tactics, misrepresentation and unequal bargaining position have been recognized as procedurally unconscionable *(Industralease Automated & Scientific Equip. Corp. v R.M.E. Enterprises, supra,* p 489, n 4). The foregoing examples of unconscionable elements are by no means exhaustive; nor would we attempt to define a hierarchy of importance for any particular element in all cases. The weight to be given to each factor is as variable as the facts of each individual case. Where the disparity in the consideration exchanged by the parties is overwhelming, that factor alone "may be sufficient to sustain [a finding that the contract is unconscionable]", since such disparity "itself leads inevitably to the felt conclusion that knowing advantage was taken of [one party]" *(Jones v Star Credit Corp.,* 59 Misc 2d 189, 192 [WACHTLER, J.]).

■ At bar, the contract of the parties *qua* "sale" is grossly unconscionable in the substantive sense. In return for the stated conveyance of more than 300 works of art, Mrs. Friedman received neither the payment of a purchase price at the time of the "agreement" nor the right to receive a fixed price within a definite time in the future. Instead, she obtained only the uncertainty of payment to be made if and when sales were effected. Complete control over the timing of these "future sales" was placed in the hands of the dealer.

The "consideration" given by the dealer actually resulted in a situation where his interests were potentially adverse to the widow's. By holding out for a price far in excess of the fair market for the art works, the dealer could deny Mrs. Friedman any payment whatsoever. The dealer would, however, still retain title to the paintings. The incentive for the dealer to make any sales was therefore questionable. If he made no sales, he owned the collection outright. If he made sales, he would have to part with 50% of the purchase price.

This conflict of interest is reflected by the actual course of events over the last 15 years. From the date the contract was signed until Mrs. Friedman's death, Egan held only one exhibition of the Friedman paintings and made only one sale. Although the expert testimony established that dealers ordinarily seek to promote an artist's reputation through exhibits, catalogs and other efforts, Egan's own testimony was that he "protected", "watched" and "nursed" the paintings (at least during the period 1963-1969). It was certainly in his own self-interest to do that—and nothing more.

Viewed as a sale, the contract gave Egan similar latitude in the opposite direction. He could "dump" the paintings at a minimal price in order to raise immediate cash. While there is no indication that he did so, the opportunity for such abuse was present.[10]

In sum, the "consideration" given for this "sale" was so contingent and so dependent upon the discretion of one who had a "built-in" conflict of interest as to be grossly inadequate. This patent inadequacy so permeates the "agreement" as to render it unconscionable. As Virginia Zabriskie put it at the hearing, "[t]here is nothing in it for the artist."

Furthermore, although the substantive unconscionability here present predominates, there are elements of procedural unconscionability attendant upon the execution of this con-

---

**10.** There are indications that the one painting which was sold in 1974 *was* sold at a low price. Egan testified that he wanted the collector "to buy a whole lot of * * * [Friedman's work] and wanted to make a very low price for him * * * but he * * * liked [only] one painting". Although the tactic of selling one painting "low" in order to arouse further interest in the artist's work is a valid business practice, it could verge on the unethical when one artist's work is sold "low" in order to promote the dealer's general inventory of works by other artists (at least where the "bait" is on consignment or the dealer is otherwise accountable to the artist for part of the sales price). There is no indication of any such impropriety in connection with the 1974 sale. However, once again, the potential for abuse was present if the "agreement" is considered a sale.

tract which negate the possibility of any salvation for this "agreement". At the time the "agreement" was entered into, Mrs. Friedman was about 75 years of age. Her only formal education had been at a convent in France. There was testimony at the hearing to the effect that she had no real business experience and that she displayed "an unworldly attitude" towards business matters. She did not have her own lawyer and professed that she could not afford one.

In contrast, when the agreement was executed, Charles Egan had been in business nearly 30 years and had spent 18 years as the owner of his own gallery. He was represented by his own attorney who had participated in previous transactions between Egan and other artists. His attorney drafted the agreement and "explained" it to the widow.

It strains credulity to believe that Mrs. Friedman was told the full ramifications of the document she was signing. Was she told, for instance, that the "consideration" given by Egan was subject to an inherent conflict of interest? True it is that there exists in every contract an implied covenant of good faith and that Egan promised to use his "best efforts" to promote the paintings. But the phrase "best efforts" is a slippery one in the absence of any checks on the promisor, and the potential for abuse here was so great, that it is difficult to conceive of any truly informed person entering into such an "agreement".

After 15 years of exile, Arnold Friedman's legacy should be returned to his family.

SHAPIRO, J. P., COHALAN and O'CONNOR, JJ., concur.

Decree of the Surrogate's Court, Queens County, dated August 16, 1977, affirmed insofar as appealed from, with costs to petitioner payable personally by appellant.