Kathryn BRENNAN, Plaintiff,

v.

BALLY TOTAL FITNESS, Defendant.

No. 01 Civ. 533(SAS).

United States District Court,
S.D. New York.

Jan. 2, 2002.

Mona C. Engel, Law Offices of Robert F. Danzi, Westbury, New York, for Plaintiff.

Jed L. Marcus, Gotta, Glassman & Hoffman, P.A., Roseland, New Jersey, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

In January 2001, Kathryn Brennan sued her former employer, Bally Total Fitness Corp. ("Bally"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 1201 *et seq.*, alleging that she was the victim of sexual harassment and disability discrimination. Relying on the fact that Brennan signed an arbitration agreement, Bally moved to dismiss the Complaint and compel arbitration in accordance with Sections 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3 and 4.

In July 2001, this motion was denied pending further discovery on the issue of whether the arbitration agreement that Brennan signed was an unconscionable contract. *See Brennan v. Bally Total Fitness,* 153 F.Supp.2d 408 (S.D.N.Y.2001) (*"Brennan I"*). After the parties conducted discovery, they presented witnesses along with other evidence at a jurisdictional hearing held in October 2001. *See* 10/30/01 Transcript of Jurisdictional Hearing ("Tr.").

Because I now conclude that the agreement to arbitrate was unconscionable and therefore unenforceable, Bally's motion to dismiss the Complaint and to compel arbitration is denied. For the same reason, Brennan's cross-motion to strike the defense and stay arbitration is granted.

### I. PROCEDURAL HISTORY

On December 17, 1998, Brennan signed a document entitled "Employee Dispute Resolution Procedure" (the "EDRP" or

"Agreement"). *See Brennan I,* 153 F.Supp.2d at 410. *Brennan I* held that because this document qualified as an entire arbitration agreement (rather than an arbitration clause within a contract), this Court has jurisdiction to decide its enforceability. *Id.* at 414–15. Further, *Brennan I* determined that the focus of the Court's inquiry must be the first agreement and not the subsequent versions. *See id.* at 415 (holding that subsequent versions of the EDRP were not valid contracts because their formation did not conform to the requirements for contract modification set forth in the original EDRP).

At the jurisdictional hearing held on October 30, 2001, Bally presented two witnesses. The first witness was Fred Infante, Regional Director of Human Resources and a Bally attorney, who presented the arbitration agreement at the December 17, 1998 meeting in Sheepshead Bay, Brooklyn. *See* Tr. at 78. The second witness was John Donovan, Area Supervisor at Bally, who worked at Bally's Sheepshead Bay at the time of the meeting in 1998. *See id.* at 205. Brennan testified at the hearing, and also presented Yvette Diaz, a close friend and assistant manager/program director at the Bally's Sheepshead Bay facility at the time of the 1998 meeting. *See id.* at 137, 167.

## II. FINDINGS OF FACT

Based on the pleadings, the affidavits, and the testimony at the hearing, I make the following findings of fact. Brennan began working for Bally in January 1996. *See* Complaint ("Compl.") ¶ 8. In June 1998, Brennan complained to Fred Infante, Bally's contact person for employee complaints of harassment, that she was being sexually harassed by her manager, Mike Senal. *See* 3/28/01 Affidavit of Kathryn Brennan ("Brennan Aff.") ¶ 4. Infante was responsible for investigating Brennan's complaint against Senal. *See id.* ¶¶ 4–5. Infante interviewed Brennan and asked her to write out a statement of her complaint in front of him. *See id.* Infante did not provide Brennan with a copy of her complaint or his interview notes. *See id.*

Bally took no remedial action against Senal, nor did it take any steps to prevent further harassment of Brennan. *See* Compl. ¶ 16. Therefore, to avoid Senal, in July 1998 Brennan transferred to the Bally facility in Bensonhurst, Brooklyn, which required a demotion, pay cut, and extra travel time and expenses. *See id.* ¶ 17. Her complaint of sexual harassment, however, remained pending on the basis of her allegations of ongoing sexual harassment by managers at the Bensonhurst facility. *See Brennan I,* 153 F.Supp.2d at 413 n. 11.

In December 1998, while working at the Bally facility in Bensonhurst, Brennan received a fax requiring her attendance at an educational meeting about sexual harassment to be held at the Sheepshead Bay facility (the "1998 Meeting" or "Meeting"). *See* Brennan Aff. ¶ 8; Tr. at 12. About twenty Bally employees attended the meeting. *See* Tr. at 14. At the meeting, the employees were shown a video depicting incidents of sexual harassment. *See* Brennan Aff. ¶ 9; Tr. at 16. Fred Infante, the Bally attorney who had investigated Brennan's complaint earlier that year, ran the meeting. *See* Brennan Aff. ¶ 9; Tr. at 15.

As soon as the video ended, Infante distributed a sixteen-page, single-spaced document that he described as containing procedures for bringing employment discrimination claims.[1] *See* Brennan Aff. ¶ 9;

---

1. The original EDRP is attached as Exhibit 1 to the Certification of Fred Infante ("Infante

Tr. at 17, 20–21. Infante told the employees to review the document, sign and return it. *See* Brennan Aff. ¶ 9; Tr. at 19. Infante spent approximately five minutes presenting the document to the employees.[2] *See* Brennan Aff. ¶ 12; Tr. at 20. He did not explain what it was or why the employees had to sign it, except to state that it contained internal procedures for filing complaints. *See* Tr. at 20. He did not mention the words "arbitration" or "alternate dispute resolution." *See id.* at 21. When an employee asked what would happen if she did not sign the document, Infante responded that anyone who did not sign the Agreement would not be considered for a promotion.[3] *See* Brennan Aff. ¶ 10; Tr. at 19, 37, 43, 109, 160–61 (including Infante testimony).

After distributing packets containing the Agreement, Infante left the room for several minutes to make a telephone call. *See* Brennan Aff. ¶ 11. He returned to collect the signed Agreements, standing where he could monitor the employees as they turned in their packets. *See* Tr. at 23–24. In addition, he asked each employee aloud whether she had signed it. *See id.* He also checked the signature page of each Agreement. *See id.*

Infante never explained that the employees could take the Agreement home and return it later. *See id.* at 22. Nor did he ever recommend that the employees show

the Agreement to an attorney before signing it. *See* Brennan Aff. ¶ 11; Tr. at 19.[4]

Fearful that she might lose her job, Brennan signed and returned the Agreement to Infante. *See* Brennan Aff. ¶ 11; Tr. at 21. Brennan believed that not signing the EDRP would brand her as a "red flag" to Infante, who knew that she had previously brought a sexual harassment complaint against one of her supervisors. Tr. at 20–21. I find that Brennan reasonably believed that her failure to sign would lead to her termination. *See id.*

As Brennan testified, she did not understand the legal significance of the Agreement. *See* Tr. at 39. Moreover, she was not told that it would affect her pending sexual harassment complaint against Bally for continuing violations by several of her supervisors at the Bensonhurst facility. *See* Brennan Aff. ¶¶ 15–16; *see also Brennan I*, 153 F.Supp.2d at 413 n. 11. It is not clear that Brennan would have signed the Agreement had she known that it would affect her pending complaint. *See* Brennan Aff. ¶ 16.

On August 19, 2000, Brennan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Compl. ¶ 33. Brennan quit her job in August 2000 due to an alleged pattern of sexual harassment and discrimination against her for being pregnant. *See id.* ¶ 32. On January 8, 2001,

Cert.").

**2.** Infante, on the other hand, testified that he reviewed each and every paragraph of the EDRP with the attending employees. *See* Tr. at 105–08. He testified further that if he showed a video, it was on the topic of arbitration procedure, not sexual harassment, and that the presentation of the arbitration agreement itself lasted 40–45 minutes. *See id.* I do not find this testimony credible. In contrast, I credit Brennan's testimony on these points.

**3.** Infante also barked to this same employee, "sign it or don't sign it." *See* Tr. at 38 (Brennan testimony). I do not find that this statement dispelled the atmosphere of coercion that Infante otherwise created. *See infra* Part IV.B.1 (discussing the coercive atmosphere at the meeting).

**4.** John Donovan testified that Infante informed the employees at the meeting that they could have the Agreement reviewed by a lawyer. *See* Tr. at 218. I do not find this testimony credible.

the EEOC issued Brennan a right-to-sue letter. *See id.* This action was commenced two weeks later.

## III. LEGAL STANDARD

### A. Motion to Dismiss

■ Defendant has moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and to compel arbitration pursuant to the FAA. On a motion to dismiss for lack of jurisdiction, a court may consider materials outside of the pleadings. *See* Committee Note, Fed.R.Civ.P. 12(b)(1).

### B. Motion to Compel Arbitration

#### 1. Agreement to Arbitrate

■ When deciding whether to compel arbitration, a district court must first consider whether there is an agreement to arbitrate. *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987); *Wright v. SFX Entm't Inc.*, No. 00 Civ. 5354, 2001 WL 103433, at *2 (S.D.N.Y. Feb 7, 2001).[5] Courts apply generally accepted principles of contract law to determine whether parties have agreed to arbitrate. *See Thomson–CSF S.A. v. American Arbi-*

*tration Ass'n.*, 64 F.3d 773, 776–77 (2d Cir.1995); *Genesco*, 815 F.2d at 845; *Chanchani v. Salomon/Smith Barney, Inc.*, No. 99 Civ. 9219, 2001 WL 204214, at *2 (S.D.N.Y. Mar. 1, 2001).[6] For example, an agreement to arbitrate that was the product of economic duress or coercion is invalid. *See, e.g., Chanchani*, 2001 WL 204214, at *2 (holding that a party is not bound by a signed arbitration agreement where she "can demonstrate special circumstances, such as duress or coercion, that contradict her intent to be bound"); *Gonzalez*, 1999 WL 595632, at *3 (same). Similarly, a party will not be bound by an arbitration agreement that is unconscionable.[7]

#### 2. Unconscionability

■ An agreement is unenforceable when it is unconscionable. *See Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988). An unconscionable contract is "one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms." *Id.* (citing *Corbin on Contracts*

---

**5.** If there is an agreement to arbitrate, a court must then determine: (1) the scope of that agreement; (2) whether Congress intended the federal statutory claims to be nonarbitrary; and (3) whether to stay related proceedings. *See Genesco*, 815 F.2d at 844; *Wright*, 2001 WL 103433, at *2.

**6.** Although the FAA is a federal statute, district courts have applied principles of state contract law to evaluate the validity of an agreement to arbitrate. *See, e.g., Arakawa v. Japan Network Group*, 56 F.Supp.2d 349, 352 (S.D.N.Y.1999) (applying New York law); *Gonzalez v. Toscorp Inc.*, No. 97 Civ. 8158, 1999 WL 595632, at *3 (S.D.N.Y. Aug. 5, 1999) (same).

**7.** The Supreme Court has stated that while "the FAA's purpose was to place arbitration agreements on the same footing as other con-

tracts ... [,] courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that where there were no other indicia of fraud or coercion, the disparity in bargaining power between plaintiff, an experienced businessman, and his securities dealer employer, was not great enough to find that plaintiff was coerced into agreeing to the arbitration clause in his registration application). Claims of unequal bargaining power or other procedural inadequacies in the formation of agreements to arbitrate must be resolved on a case by case basis. *See id.*

§ 128). In other words, a contract is unconscionable where there is "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Id.* (citing *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)); *see also Desiderio v. National Ass'n of Sec. Dealers*, 191 F.3d 198, 207 (2d Cir.1999), *cert. denied*, 531 U.S. 1069, 121 S.Ct. 756, 148 L.Ed.2d 659 (2001) (quoting 8 Samuel Williston, *A Treatise on the Law of Contracts* § 18:9, at 54 (4th ed.1998)); *see also* Uniform Commercial Code § 2–302 (codifying common law doctrine of unconscionability). In New York, unconscionability generally requires both procedural and substantive elements. *See Gillman*, 73 N.Y.2d at 10, 537 N.Y.S.2d 787, 534 N.E.2d 824. In determining whether a contract is unconscionable, a court should take a "flexible" approach, examining "all the facts and circumstances of a particular case." *In re Estate of Friedman*, 64 A.D.2d 70, 407 N.Y.S.2d 999, 1008 (2d Dep't 1978).

### a. Procedural Element of Unconscionability

■ The test for procedural inadequacy in forming a contract is whether, in light of all the facts and circumstances, a party lacked "a meaningful choice" in deciding whether to sign the contract. *Desiderio*, 191 F.3d at 207. Although it is true that "one who signs an agreement without full knowledge of its terms might be held to assume the risk that [s]he has entered a one-sided bargain," this rule does not apply if a plaintiff is able to demonstrate an absence of meaningful choice. *Id.* To determine whether a contract was validly formed, a court should focus on evidence of high pressure or deceptive tactics, the use of fine print in the contract, and any disparity in experience and education, *i.e.* bargaining power, between the parties. *See Wright*, 2001 WL 103433, at *3; *Gillman*, 73 N.Y.2d at 10–11, 537 N.Y.S.2d 787, 534 N.E.2d 824; *see also Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir.1997) ("Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis with no opportunity to change the terms."); *Brower v. Gateway 2000*, 246 A.D.2d 246, 676 N.Y.S.2d 569, 573 (1st Dep't 1998) (describing disparity in bargaining power as turning on the "experience and education of the party claiming unconscionability"). While inequality in bargaining power between employers and employees is not alone sufficient to hold arbitration agreements unenforceable, *see Gilmer*, 500 U.S. at 33, 111 S.Ct. 1647; *Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 139, 538 N.Y.S.2d 513, 535 N.E.2d 643 (1989), such inequality, when coupled with high pressure tactics that coerce an employee's acceptance of onerous terms, may be sufficient to show that an employee lacked a meaningful choice.

### b. Substantive Element of Unconscionability

■ A contract is substantively unconscionable where its terms are unreasonably favorable to the party against whom unconscionability is claimed. *See Desiderio*, 191 F.3d at 207. While the procedural aspect of unconscionability is shown by reference to the contract formation process, "substantive elements of unconscionability appear in the context of the contract per se...." *Friedman*, 407 N.Y.S.2d at 1008.

## IV. DISCUSSION

### A. No Agreement to Arbitrate

■ Brennan argues that the EDRP is an unconscionable contract of adhesion be-

cause Bally did not allow her enough time to review and understand it, and coerced her agreement to its terms, which are unreasonably favorable to Bally. *See* Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss and Compel Arbitration and Cross–Motion to Strike Defense and Stay Arbitration ("Pl.Opp'n.") at 13. I agree.

### 1. Lack of a Meaningful Choice (Procedural Element)

▮ The circumstances of the contract's formation show that Brennan lacked a "meaningful choice" when entering into the EDRP. The evidence shows that Infante used high pressure tactics to coerce the employees into signing the Agreement. During the 1998 Meeting, Infante gave the employees no more than fifteen minutes to review a sixteen-page single-spaced document, and never mentioned or suggested that the employees could review the Agreement at home or with an attorney. He threatened the employees that those would did not sign the document would not be promoted.[8] He did not address the impact the EDRP would have on pending complaints against the company. At the end of the Meeting, he asked aloud whether each employee, including Brennan, had signed the Agreement. As a result of these pressure tactics, Brennan reasonably felt that she had no choice but to sign the EDRP or she would lose her job. *See supra* Part II (finding that Brennan reasonably believed

she would be terminated for failing to sign the EDRP).

The significant disparity in bargaining power that existed between the parties also contributed to Brennan's lack of a meaningful choice in deciding whether to sign. Brennan was an unrepresented, single mother who was then pregnant with twins, and lacked other adequate means of support. *See* Pl. Opp'n. at 14. She was dependent on her job for the health insurance it provided, and was particularly afraid of losing her health coverage because of her high-risk pregnancy. *See id.* Bally, on the other hand, is a large corporation with offices nationwide, *see id.* at 13 (citing Compl. ¶¶ 3, 4), and was represented at the meeting by an in-house attorney, Infante. Moreover, Infante was the same person who was responsible for investigating Brennan's complaint of harassment and as a result had considerable leverage over her.

To summarize, there are many circumstances supporting the conclusion that Brennan lacked a meaningful choice in deciding whether or not to sign the Agreement: (1) the considerable disparity in bargaining power between Brennan and Bally; (2) Infante's failure to give the employees adequate time to review the contract; (3) Infante's failure to inform the employees that they could review the document with an attorney; (4) Infante's conceded threat that those who refused to sign would not be promoted; and (5) Infante's failure to address the impact that

---

8. I note that continued employment and promotion constitute valid consideration for agreeing to alternate dispute resolution. *See Tuskey v. Volt Info. Sci., Inc.,* No. 00 Civ. 7410, 2001 WL 873204, at *4 (S.D.N.Y. Aug. 3, 2001); *see also Arakawa,* 56 F.Supp.2d at 352 (holding that arbitration agreement was not invalid merely because employee signed it

to keep her job, absent other allegations of unfairness, oppression or unconscionability). Infante's threat contributed to the coercive atmosphere and, taken with other factors, leads to the conclusion that Brennan lacked a meaningful choice in deciding whether to sign the Agreement.

the EDRP would have on any pending complaints against Bally.

### 2. Unreasonably Favorable Terms (Substantive Element)

■ The EDRP is substantively unconscionable because its terms unreasonably favor Bally.[9] *See Desiderio*, 191 F.3d at 207. Generally, "arbitration agreements that bind both parties to arbitration may not be said to favor the stronger party unreasonably." *Id.* By signing the EDRP, the Bally employees lost their right to pursue certain damages remedies against Bally, agreed to a cap on certain damage awards and accepted a shorter limitations period for bringing claims.[10] While these particular terms favor Bally, they are not unreasonable or unconscionable. However, the EDRP is unreasonably favorable to Bally because (1) its terms allow Bally to unilaterally modify the contract at any time,[11] thus binding employees to a contract they may never have seen; and (2) the EDRP denied Brennan the right to proceed in court on her pending sexual harassment claim against the company.[12]

### V. CONCLUSION

Judging the contract in light of "all the facts and circumstances of [this] particular case" as I must, *Friedman*, 407 N.Y.S.2d at 1008, I conclude that the agreement to arbitrate was unconscionable, and is therefore unenforceable. As a result, there was no agreement to arbitrate. *See Wright*, 2001 WL 103433, at *2 (factor (1)). Therefore, defendant's motion to compel Brennan to arbitrate is denied. For the same reason, Brennan's cross-motion to strike the defense of arbitration and stay arbitration is granted.

---

9. Defendant argues that because other courts have upheld Bally's arbitration agreement with its employees, the Agreement is not unconscionable. *See* 6/4/01 Defendant's Supplemental Affidavit ("Supp.Aff."), at 1–2 (referring to *Austin v. Bally Total Fitness Corp.*, No. 00 Civ. 2459 (W.D.Pa. May 17, 2001) ("*Austin* Order"), Ex. A to Supp. Aff.); Defendant's Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Complaint ("Def.Mem") at 7 (referring to *Catalan v. Bally Total Fitness Corp.*, No. 00 Civ. 1005 (N.D.Ill. July 7, 2000) ("*Catalan* Order"), Ex. D to Def. Mem.). Both the *Austin* and *Catalan* orders are one-page unpublished orders. In *Austin*, the plaintiff consented to the motion to dismiss and compel arbitration. *Austin* Order. The *Catalan* Order granted defendant's motion to dismiss and compel arbitration, without any discussion. *Catalan* Order. Because neither Order is binding on this Court, because defendant does not attempt to show that either arbitration agreement was the same as the

Agreement in this case, and because I find the circumstances presented here render the EDRP unconscionable with respect to Brennan, defendant's argument is unpersuasive.

10. *See* EDRP §§ 4.1, 19.

11. *See* EDRP § 25.1 (allowing for unilateral modification by Bally and requiring only thirty days notice to the employee); *see also Brennan I*, 153 F.Supp.2d at 415 (noting that section 25.1 contradicts section 24.3, which provides that the EDRP can only be modified or revoked "by a writing, signed by both the Employee and the president or a representative of the Employer.").

12. *See* EDRP § 1.1 (plan covers sexual harassment and discrimination claims), § 1.5 ("This EDRP shall apply to any Covered Dispute whether it arises or is asserted during or after termination of the Employees [sic] employment with Employer.").