■ BROOKE SHIELDS, Appellant, v GARRY GROSS, Respondent. — Judgment, Supreme Court, New York County (Greenfield, J.), entered November 18, 1981, after nonjury trial, in an action alleging violation of sections 50 and 51 of the Civil Rights Law, which dismissed the complaint and denied plaintiff's application for a permanent injunction except to the extent of enjoining defendant from using or permitting the use of the photographs in pornographic publications or publications whose appeal is of a predominantly prurient nature, modified, on the law, without costs or disbursements, and defendant is further permanently enjoined from the use of the photographs at issue for purposes of advertising or trade. Plaintiff, now 16 years of age, is an internationally known model and actress. Defendant is a prominent, highly regarded photographer. In September of 1975, when plaintiff, then 10 years old, was less well known, defendant took a series of photographs of her unclothed in a bathtub pursuant to arrangements made by Playboy Press. Although the immediate occasion for the taking of these photographs was their intended *inclusion in a book* "Portfolio 8" plaintiff's mother and professional manager, Teri Shields, signed at the defendant's request broad consent forms which in terms granted the defendant the unrestricted right to "use, reuse, and/or publish or republish" the photographs. Thereafter, in connection with other photographic assignments, and during the same general period of time, defendant took several other series of photographs of plaintiff. During these photographic sessions plaintiff was clothed. Plaintiff's mother signed similar consents with regard to these photographs. In 1978, several of defendant's photographs of plaintiff, clothed and unclothed, appeared in a French magazine called *Photo.* Disturbed by this publication, and the information that defendant intended further commercial use of the photographs, plaintiff undertook to purchase them from the defendant. When the negotiations proved unsuccessful, the instant action was brought, seeking a permanent injunction and damages pursuant to sections 50 and 51 of the Civil Rights Law. Plaintiff then moved for a preliminary injunction. Special Term (Helman, J.) granted plaintiff's motion for a preliminary injunction, finding that factual issues were

presented with regard to the meaning and validity of the consents signed by plaintiff's mother, but going on to conclude that the consent provisions of sections 50 and 51 of the Civil Rights Law effectively rescinded as to an action brought thereunder the right of an infant to disaffirm a contract consented to by a parent. The trial court resolved the factual issues presented as to the meaning and validity of the consent forms in favor of the defendant and we find no basis in the record for disturbing the conclusions he reached. Quite properly the trial court did not consider whether an infant may disaffirm a parent's consent in an action under sections 50 and 51 of the Civil Rights Law, that issue having been determined by Special Term. That question presents the principal issue on this appeal. We disagree with the conclusion reached by Special Term, find that the infant could lawfully disaffirm her parent's consent, and did so, and accordingly reverse the judgment below and enjoin the defendant from the use of the photographs at issue for purposes of advertising or trade. In this State, as elsewhere, it has long been the general rule that an infant has the right to disaffirm a contract even when the contract has been entered into on behalf of the infant by a parent or guardian. (See, e.g., *Lee v Silver,* 262 App Div 149, affd 287 NY 575; *Aborn v Janis,* 62 Misc 95, affd 122 App Div 893.) The right of disaffirmance by an infant was recognized by the Legislature when it established 18 as the age after which a contract may not be disaffirmed on the ground of infancy. (General Obligations Law, § 3-101, subd 1.) Where the Legislature has determined in particular instances to limit or deny an infant the right of disaffirmance, it has invariably done so in explicit terms. For example, subdivision 3 of section 3-101 of the General Obligations Law provides that where a husband or wife seeks to occupy real property as a home and in connection therewith contracts for a loan or executes contracts, notes, mortgages, etc., "no such husband or wife shall have the power to disaffirm, because of minority [such] act or transaction * * * nor shall any defense based upon minority be interposed in any action or proceeding arising out of any such act or transaction." Similarly, subdivision 1 of section 3-102 of the General Obligations Law provides: "An obligation incurred by a married minor for hospital, medical and surgical treatment and care for such minor or such minor's children shall not be voidable because of minority." To the same effect is section 3-103 of the General Obligations Law relating to certain contracts entered into pursuant to the Servicemen's Readjustment Act of 1944. Significantly, in subdivision 1 of section 3-105 of the General Obligations Law the Legislature established a procedure for obtaining judicial approval of a contract made by an infant, or his parent, or guardian, for the infant's services in the performing arts or professional sports. The section includes this language: "If the contract is so approved the infant may not, either during his minority or upon reaching his majority, disaffirm the contract on the ground of infancy or assert that the parent or guardian lacked authority to make the contract." Paragraph e of subdivision 2 goes on to reserve to the court the continuing power to revoke its approval of the contract or declare the approval revoked unless the contract is appropriately modified. We do not perceive in the wording of sections 50 and 51 of the Civil Rights Law any clear manifestation of a legislative intent to limit the long-established rights of infants to disaffirm contracts approved by a parent with regard to actions brought under those sections. Section 50 provides: "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." Section 51 makes a violation of section 50 actionable in a civil suit. It specifically provides, as relevant to this case, that "[a]ny person whose name,

portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use". The manifest purpose of the requirement of parental consent in these sections was to protect someone who secured such consent from being prosecuted criminally, or subject to an action for damages or injunctive relief, with regard to activities embraced in the sections during the period the consent was effective. Nothing in the sections even purports to address the infant's right to disaffirm such consent, and we see nothing in the language of the sections nor the rights that they were designed to protect that would require an interpretation so inconsistent with the general common-law principle and the clear meaning of the statutory pattern described above. Accordingly, the judgment dismissing the complaint, and denying, except in one limited respect, plaintiff's right to a permanent injunction, is modified and defendant is enjoined from using any pictures of plaintiff at issue here for purposes of advertising or trade. Concur — Sandler and Silverman, JJ.; Kupferman, J. P., concurs both with the memorandum of the court and in a separate memorandum; Asch, J., concurs in a separate memorandum; and Carro, J., dissents in a memorandum, all as follows:

Kupferman, J. P. (concurring). The facts set forth in the memorandum of the court and the concurring opinion of Asch, J., need no elaboration other than as hereinafter stressed. The releases signed for and on behalf of the infant, as well as the surrounding circumstances, indicate that the photographs were for a specific purpose and not for future use. The defendant made no payment, and the remuneration received by the plaintiff was from third parties for whom the photos were taken. If the releases and the photographs were to have a life beyond that current usage, then appropriately the provisions of section 3-105 of the General Obligations Law should have come into play in order to prevent disaffirmance by the infant. Even if complied with and approved by the Surrogate, the term of the arrangement could not have been for a period of more than three years. (*Matter of Prinze [Jonas]*, 38 NY2d 570.) More than the equivalent time having elapsed, the conclusion of the court that the infant has the right to disaffirm, is reinforced.

Asch, J. (concurring). I most certainly concur with the determination of my colleagues to protect a minor from exploitation. However, I disagree with the way in which they went about doing it. A more appropriate, a more direct method, and certainly one less fraught with legal uncertainty, would be the resort to the unconscionability provisions of section 2-302 of the Uniform Commercial Code under the circumstances here present. The invocation of "unconscionability" has many virtues. It authorizes the court to police outrageous transactions directly, rather than indirectly by manipulating traditional common-law doctrines. It would make it unnecessary for this court to engraft a construction on sections 50 and 51 which ultimately may not be ratified by the Legislature or the Court of Appeals. It would provide a mechanism for fact evaluation and for the fabrication of a remedy which is specifically designed to fit this case. The sale or offering for sale of the pictures of plaintiff-appellant was obviously for the purpose of trade (47 NY Jur, Privacy, § 20, p 73, and cases cited therein), and would be a sale of goods within the Uniform Commercial Code (*Carpel v Saget Studios,* 326 F Supp 1331). Because the statutory definition of unconscionability is not artificially limited, it can be easily applied herein. (See, e.g., *Nu Dimensions Figure Salons v Becerra,* 73 Misc 2d 140, 143; Ellinghaus, In Defense of Unconscionability, 78 Yale LJ 757.) The cases are usually analyzed on the basis of the procedure by which the contract

came about or the subject matter of the contract itself. (See Leff, Unconsciona-bility and the Code — The Emperor's New Clause, 115 U of Pa L Rev 485.) But the matter before us presents a pattern of both procedural and substantive unconscionability. Certainly, on the facts herein presented, the transaction is one which cries out to be characterized as "unconscionable" and to be legally treated as such. In September, 1975, Teri Shields, mother and professional manager of Brooke Shields' modeling career (then nine years in the making), agreed to have Garry Gross photograph her daughter for a series of photo-graphs. At the time, defendant was a well-known fashion photographer. Brooke Shields was a professional child-model, 10 years of age. It is asserted by the respondent that plaintiff and Mrs. Shields understood before the sessions that the shots were to include nude scenes of the model in a bathtub. Gross told them that while he hoped to do a full-length art book on the subject, the pictures would first be published in a book by Playboy Press. A mere glance at the photographs in controversy (the two published in "Sugar and Spice" and the other dozens of negatives of similar nude photographs taken by Gross during the two bathtub shootings), reviewed alone or in the published context in which they are being used, plainly demonstrates the respect in which their widespread public dissemination would damage plaintiff, both at the present time while she is still a minor and later during her majority. Justice Helman's decision expressly found that Brooke will suffer irreparable damage if the photographs are publicly released. Indeed, even Justice Greenfield's decision expressly found that "the embarrassment of Miss Shields at this juncture is poignant and understandable." In view of that fact, in view of the nature of the photographs, and in view of the further and express finding by the court below that the submission of Brooke for the taking of these photographs and the signing of the releases by the mother were "mistakes in judgment" — and obviously serious ones — Brooke, as an infant, is entitled to prevent the photographs from being publicly disseminated. Indeed, Justice Greenfield's decision appears to have tacitly recognized this principle, while not, in practi-cal terms, implementing it. Thus, as both his decision and the ensuing judgment state, the defendant may not license the photographs "for pornogra-phic magazines or to those whose appeal is of a predominantly prurient nature," and the defendant must prosecute any unlicensed uses in pornogra-phic magazines. However, as a practical matter it is impossible to effectuate this objective, other than by cutting off access to the photographs at their source — that is, by enjoining Gross from releasing the photographs — and even if it were possible to prosecute unauthorized uses, such litigation would wholly fail to protect Brooke against the risks inherent in her photographs appearing in such publications. Photographs have already appeared — unli-censed by Gross, according to Gross — in two sexually oriented magazines: one named *Celeb* and one named *Rustler,* which appeared on the newsstands in New York City subsequent to Justice Greenfield's judgment. What publication in these magazines clearly demonstrates is that the nude photographs of Brooke will, as a practical matter, wind up in pornographic or sexually oriented magazines if they are released. In other words, whether or not Gross himself licenses the photographs to pornographic magazines, they will as a matter of certainty wind up in magazines of this type. If Gross is permitted to release all of the photographs at issue, the photographs will obviously become readily available to anybody who wants them and there would in that event be absolutely no practical way of policing their usage. Indeed, Gross' claim that he had nothing to do with the photographs' appearance in *Celeb* and *Rustler* clearly demonstrates that even if Gross were not to license the photographs to such magazines, the photographs will nevertheless appear in such magazines

anyway, once copies of the photographs become readily accessible through their release by Gross. It is not that the photographs are pornographic which renders their circulation unconscionable. It is that they violate a quintessential right of privacy. Many primitive people prohibit the depiction of one's likeness because of fear that such pictorial representation results in loss of one's soul or identity. (See, e.g., Gusinde, Die Feurland Indianer, Bard I, Die Selk'nam, p 88 [1931].) Perhaps such cultural mores find deep-seated psychological validation. Consider that the reaction of Brooke Shields to the publication of these photographs could be the reaction of any teenage female. "I'm embarrassed by those photos. I wasn't embarrassed when they were taken, but since then I've become more conscious of boys, of my body and myself. Now I just want to be myself. Those pictures are not me now." (Brooke and Teri, *Us,* Jan. 19, 1982, p 65; see *Shields v Gross,* NYLJ, Nov. 16, 1981, p 13, col 1; see, also, Lovelace, Ordeal, pp 1, 261 [1980].) Certainly, a girl of 16 (still a minor), no matter how worldly or sophisticated she may appear in photographs, has the right to the sanctity of her bodily image, to be inviolate from the exposure of the private parts of her body, as well as the opportunity to change her public representation or the direction of her life. It seems significant to note that State intervention to protect young people from sexual exploitation has considerably increased in recent years. (See Sexual Exploitation of Children, Hearings Before Subcommittee on Crime of House Committee on Judiciary, 95th Congress, 1st Session [1977]; Sexual Exploitation of Children, Hearings Before Subcommittee on Select Education of House Committee on Education and Labor, 95th Congress, 1st Session.) Brooke Shields was not a third-party beneficiary of a contract but rather a hapless child victim of a contract of adhesion to which two grasping adults bound her. It is not convincing for the respondent to argue, as he does, that Brooke (at age 10) gave her consent to pose for these pictures. And whether her earnings will increase or decrease if the photographs are returned is beside the point. Gross, himself, paid nothing for the photographs and has been amply rewarded for them to date, both financially and professionally. Section 2-302 of the Uniform Commercial Code seems custom made for the problem presented to the court. The court at nisi prius gave the parties "a reasonable opportunity to present evidence" to aid the court in making the determination, as provided by subdivision (2) of section 2-302. And under subdivision (1) of the same section, the court has ample discretion to "refuse to enforce the contract", or to "enforce the remainder of the contract without the unconscionable clause," or to "limit the application of any unconscionable clause as to avoid any unconscionable result". Thus, the advantage of employing the "unconscionability" provisions of section 2-302 in this case is that the court may take direct action to require the return of those photographs which offend rather than set aside the entire transaction. It may be noted that the doctrine of unconscionability finds ample authority even dehors the Uniform Commercial Code as part of the equitable heritage which has come down from chancery, long antedating the code. (See *Graf v Hope Bldg. Corp.,* 254 NY 1; *Ferlazzo v Riley,* 278 NY 289; Hillman, Debunking Some Myths About Unconscionability: A New Framework for U. C. C. Section 2-302, 67 Cornell L Rev 1, 35-41, and cases there cited.) In addition "unconscionability" is viable as a result of the ripple effect of section 2-302 being applied to cases which may not quite meet the code's requirements. (*Matter of Yale Express System,* 370 F2d 433; 62 NY Jur, Uniform Commercial Code, § 12, pp 160, 161.) "In any event, it is not critical whether the doctrine of transactional incapacity is supported by traditional case law or statutes. The unconscionability principle allows the courts to adopt, on analytical grounds alone, a rule denying full enforcement of promises induced by exploitation of the promisor's intellectual, experiential, or judgmental inability to deal com-

petently with the transaction at hand." (Eisenberg, The Bargain Principle and Its Limits, 95 Harv L Rev 741, 769.)

Carro, J. (dissenting). I would affirm. Sections 50 and 51 of the Civil Rights Law created a new right of privacy and a new cause of action, not therefore enforceable at common law, where the portrait or picture of a living person is used for advertising or trade purposes without there having first been obtained the written consent of that person, or, if a minor, of the parent or guardian. There is no language in either section addressing an infant's right to disaffirm such consent. The infant's right to disaffirm an agreement was recognized at common law. The statutory provisions cited by the majority as limiting the right of disaffirmance by minors under the age of 18 years relate to causes of action previously in existence, where the infant already had that right and where a statutory limitation against disaffirmance was deemed necessary in order to carry out the particular legislative purpose. That is, where there was an appropriate common-law action or right already in existence there concomitantly existed a common-law right in an infant to disaffirm. But where a new right is statutorily created in derogation of common law, such as sections 50 and 51 of the Civil Rights Law, that statute "will be so construed as not to go beyond the letter", "A statute which creates a new liability or which increases a common law liability must be strictly construed, and the courts will not extend or enlarge the liability by construction, nor will they go beyond the clearly expressed provisions of the statute. Thus, a statute which creates a cause of action where none existed prior thereto, must be strictly construed, and a statute must be followed with strictness, where it gives a remedy against a party who would not otherwise be liable." (McKinney's Cons Laws of NY, Book 1, § 301, subd b, p 463; subd c, pp 465-466.) The "failure" of the Legislature, therefore, to add language to sections 50 and 51 of the Civil Rights Law either permitting or limiting disaffirmance, rather than indicating an intention to permit it, does the opposite, in accordance with the rules of statutory construction. For similar reasons the reliance by my concurring brethren, respectively, on the "unconscionability" statute (Uniform Commercial Code, § 2-302) and section 3-105 of the General Obligations Law is, to me, misplaced. Subdivision 1 of this latter statute refers quite clearly to "performing artist[s]" and by the specific examples mentioned ("actor[s], actress, dancer[s], musician, vocalist or * * * player in professional sports") it is apparent that the present case is not within its purview. Indeed, the reference in paragraph a of subdivision 2 to section 3216-c of the Education Law (repealed in 1971 and now covered by § 3229) dispels any doubt in this regard. (Compare Education Law, § 3220; Labor Law, § 172.) An equally appealing (but to me, no more valid) analogy can be made to section 219-a of the General Business Law, thereby deeming the consent form executed by Ms. Shields' mother to be only a "consignment" and the photographer an "art dealer". In Matter of Friedman (64 AD2d 70), the unconsionability provision in section 2-302 of the Uniform Commercial Code was applied to void the sale by an unrepresented widow of all of her husband's now valuable paintings, importing section 219-a of the General Business Law as a recharacterization of the unfair sale. The court, however, was careful to point out that section 2-302 of the Uniform Commercial Code merely codified the common-law doctrine of unconscionability (cf. Hume v United States, 132 US 406, 411) and was thus appropriately invoked to affirm the like determination of the Surrogate's Court. (64 AD2d, supra, at p 84.) As noted above, the case at bar is not a common-law action and was not cognizable in either law or equity until specifically declared a right with the enactment of sections 50 and 51 of the Civil Rights Law. Thus, while the court may wish to hold the unconscionability statute applicable to the sale of photographs, I do not believe the facts

justify such an extension of the law in this case. Perhaps the plaintiff and those similarly situated should have the right to disaffirm, or perhaps the dissemination and publication of photographs such as these should be within the provisions of section 3-105 of the General Obligations Law. But, if so, the remedy is legislative rather than judicial.