DUDLEY C. BARROW, Respondent, v LAWRENCE UNITED CORPO-
RATION et al., Appellants.

Third Department, March 2, 1989

**APPEARANCES OF COUNSEL**

*Roemer & Featherstonhaugh, P. C. (James D. Featherston-
haugh* of counsel), for appellants.

*Bond, Schoeneck & King (David R. Sheridan* of counsel), for
respondent.

**OPINION OF THE COURT**

Levine, J.

By agreement dated November 1, 1984 between defendant Lawrence United Corporation (hereinafter LUC), as buyer, Geer-Stillman Associates, Ltd. (hereinafter GSA), as seller, and plaintiff, as "principal", the parties agreed to the acquisition by LUC of the business assets of GSA, effective January 1, 1985. GSA was a general insurance agency operating in the greater Albany area. Plaintiff was its sole stockholder and chief executive officer. The assets specifically covered by the agreement consisted of (1) the "customer lists, expirations, files and customer account records" of GSA, as identified on a schedule of accounts annexed to the agreement, (2) the right to use GSA's trade name and "all of the good will * * * attendant thereto", and (3) GSA's furniture, equipment and supplies.

The aggregate purchase price for the sale of assets was $1,200,000, payable $300,000 in cash at the closing, $750,000 in a three-year installment note and $150,000 in LUC stock, redeemable on either the death or termination of plaintiff's employment with LUC. Employment contracts with other GSA personnel were also assigned to LUC. The aggregate purchase price was expressly allocated as follows: (1) $225,905 to furniture and equipment, (2) $904,095 to "the acquired expirations", (3) $60,000 to good will, and (4) $10,000 to the value of restrictive covenants against competition contained in the agreement.

The agreement also contained a provision (paragraph 3) for upward or downward adjustment of the purchase price on the basis of "net annual commissions" of GSA during 1985, the first full year of operation after acquisition. If net annual commissions for 1985 exceeded $700,000, the purchase price would be increased by 1.5 times the amount of the excess. Conversely, if net annual commissions were less than $700,000 for that year, the price would be decreased by 1.5 times the deficiency. Net annual commissions were defined as gross annual commissions earned or received for policies with an effective date in 1985, less return commissions and also excluding bonus and profit-sharing commissions and production bonuses, but including fees for servicing insurance business in lieu of or in addition to commissions.

It is the foregoing purchase price adjustment provision of the agreement which is in dispute. Specifically, LUC contends

that the operative phrase, net annual commissions, was understood to include only commissions from renewals of the accounts purchased under the agreement, and not to encompass commissions on new accounts produced by GSA during the first full year following acquisition. Plaintiff, to whom GSA subsequently assigned its rights under the agreement and who brought this suit, contends that net annual commissions includes commissions on *all* 1985 GSA earnings, including commissions on new business. The difference is substantial, since GSA renewal commissions were some $78,000 less than the $700,000 base figure. However, this was more than offset by the more than $238,000 in commissions GSA earned on new business written in 1985.

After issue was joined, plaintiff moved for partial summary judgment on this claim in his complaint, relying principally on the language of the price adjustment clause of paragraph 3 of the agreement, under which commissions on new business were not expressly excluded from the broadly encompassing phrase, gross annual commissions, from which the definition of net annual commissions was derived. In opposition, LUC pointed to various other provisions of the agreement which, it claimed, were inconsistent with inclusion of commissions on post acquisition new business in adjusting the purchase price. Additionally, LUC submitted the affidavit of defendant Albert W. Lawrence, its president, which, in substance, averred that plaintiff's request to include commissions on new business in the purchase price adjustment calculation had been rejected during the parties' negotiations, that it was well understood that they were not so included, and that LUC's basis of calculating the purchase price and value of GSA's business was consistent with insurance industry custom and usage.

Supreme Court granted plaintiff partial summary judgment, purportedly ruling that the proper interpretation of the agreement, as to whether commissions on new 1985 business was to be included within the purchase price adjustment calculation, can be gleaned from the "four corners of the subject document", and that "[a] limitation to renewal commission[s] would be a significant departure from the words used and defined. Such a limitation, if intended, could have been clearly and easily stated." The court, thus, refused to consider the extrinsic evidence of the parties' intent submitted by LUC, and ruled that partial summary judgment in plaintiff's favor was appropriate. This appeal by LUC ensued.

From our own reading, the entire language used by the

parties in formalizing their transaction raises sufficient doubts as to their intent with respect to inclusion of commissions on postacquisition new business in calculating the final purchase price, that resort to extrinsic evidence to interpret their agreement is justified. Since LUC submitted such evidence to support its version of the contract's meaning, and plaintiff submitted contrary evidence, an issue of fact as to the parties' mutual understanding was presented, precluding summary judgment.

Although there is no explicit treatment of new business or renewal commissions in paragraph 3 of the agreement, taking the words of the price adjustment clause literally and in isolation, they indeed offer a strong implication consistent with plaintiff's position. The annual commissions are, under that provision, based upon gross commissions received in 1985, except for certain items specifically set forth. In failing to expressly include a deduction from gross annual commissions for earnings attributable to 1985 new business, it can be inferred, under familiar canons of construction, that such commissions were not intended to be deducted from gross commissions in the contractual formula *(see, Two Guys from Harrison-N.Y. v S.F.R. Realty Assocs.,* 63 NY2d 396, 404). Other canons of construction, however, would support a contrary interpretation. Thus, it is equally settled law that specific clauses of a contract are to be read consistently with the over-all manifest purpose of the parties' agreement *(see, Matter of Herzog,* 301 NY 127, 135; *Eighth Ave. Coach Corp. v City of New York,* 286 NY 84, 88; *Matter of Friedman,* 64 AD2d 70, 81). Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms *(see, Robshaw v Health Mgt.,* 98 AD2d 986).

In the instant case, the contact clearly reveals that the dominant objective of the transaction was the sale and acquisition of GSA's existing accounts. Apart from the cost of the physical equipment and furniture, the parties attributed more than nine tenths of the purchase price (over $900,000) to the value of GSA's "expirations". The meaning of that term is well recognized in the industry as referring to "a copy of the policy issued to the insured which contains the date of insurance, the name of the insured, the expiration, amount, premiums, property covered, and terms of insurance, and is valuable in that it furnishes leads for the solicitation of *expiring insurance and * * * renewals"* (4 Couch, Insurance 2d § 26A:260, at 493-494 [rev ed] [emphasis supplied]; *see, Matter*

*of Corning,* 108 AD2d 96, 99, *appeals dismissed* 66 NY2d 695). GSA's expirations unquestionably were the same assets outlined in the accounts set forth in the schedule attached to the agreement.

Contrastingly, the buyer and seller placed a comparatively minor value ($60,000) on good will, the item in the contract most closely related to GSA's potential for generating new business. It would be incongruous indeed for the parties, in a transaction where the major objective was the transfer of expirations and in which the transfer of good will was essentially only of incidental value, to have intended that the purchase price would be drastically increased for commissions on new business. The anomaly is underscored here, where plaintiff seeks credit for new business commissions of $238,000, which, under the adjustment formula, would enhance the purchase price by $357,000, about 40% of the stated value of the expirations—the major intangible asset in the transaction.

An intent to include postacquisition new business income in the calculation of the purchase price adjustment is further cast in doubt by paragraph 6 of the agreement. Under that provision, LUC was required to segregate and separately identify *"the accounts acquired from the [s]eller hereunder* from its other accounts * * * *for purposes of identifying the business on which commissions shall be due to the [s]eller"* (emphasis supplied). Both parties in their briefs agree that this clause was inserted in order to identify the 1985 GSA commissions to be used in adjusting the purchase price. Yet, under paragraph 6, LUC's obligation to separately earmark such commissions only extends to those derived from the acquired existing accounts, and not to new business accounts. Under the same canon of construction plaintiff relies upon to support his interpretation of the purchase price adjustment provision, the inclusion in paragraph 6 of a segregation requirement as to preacquisition accounts, for "purposes of identifying the business on which commissions" are to be used to calculate the purchase price adjustment, implies that commissions on new business were to be excluded from the adjustment formula *(see, Two Guys from Harrison-N.Y. v S.F.R. Realty Assocs., supra).*

Finally, at least some inconsistency exists between an interpretation of the purchase price adjustment provision to include commissions on 1985 new business and the employment agreement entered into between plaintiff and LUC dated

January 1, 1985, the effective date of the acquisition of GSA's assets. As previously noted, continued employment of plaintiff in the GSA operation was expressly referred to in the subject purchase agreement and was within the contemplation of the parties when that agreement was executed. The employment agreement expressly refers to the purchase agreement and there are overlapping restrictive covenant provisions. Thus, there is ample reason to consider the employment contract in connection with any interpretation of the purchase agreement (see, Matter of Herzog, supra, at 135; Nau v Vulcan Rail & Constr. Co., 286 NY 188, 197).[1] Under plaintiff's employment contract, he was given a base annual salary of $80,000, plus additional incentive compensation in the form of a percentage of commissions on new business generated by him and all other GSA personnel. Again, it would be anomalous for the parties to have intended that plaintiff be rewarded for the production of new business in the form of an increase of the purchase price under the purchase agreement while at the same time providing that he was to receive substantial additional remuneration for the same accomplishment under the contemporaneous employment agreement. Moreover, both the employment agreement and the purchase agreement (see, paragraph 6) also contemplate that accounts owned by LUC or produced by its sales personnel were to be integrated into the GSA business operations following acquisition. Under plaintiff's interpretation of the purchase price adjustment clause, GSA commissions on new business transferred or generated by LUC employees would also be included in calculating the enhanced purchase price, although not in any way attributable to the efforts of plaintiff, his former staff or GSA good will.[2] Courts avoid construing an agreement in a manner that would effectively require double compensation or produce other unreasonable or unfair results (see, Aron v Gillman, 309 NY 157, 162-163; Cerasaro, Inc. v State of New York, 97 AD2d

1. Plaintiff correctly notes that the provisions of the employment agreement as an aid in interpretation was not urged by LUC before Supreme Court. However, that agreement was attached to plaintiff's complaint and is part of the record on appeal. Our consideration solely of the instrument itself is authorized under Rentways, Inc. v O'Neill Milk & Cream Co. (308 NY 342, 349).

2. In fact, according to the uncontradicted averments of the Lawrence affidavit, some $60,000 of the $238,000 in commissions on new 1985 business forming plaintiff's claim to increase the purchase price was generated by transferred LUC employees.

598; *River View Assocs. v Sheraton Corp.*, 33 AD2d 187, 190, *affd* 27 NY2d 718).

In short, the apparent conflicts and inconsistencies between plaintiff's version of the purchase price adjustment clause and other provisions of the instruments comprising the parties' transaction, as well as with the dominant purpose of the acquisition itself, are sufficient to justify resort to extrinsic evidence to ascertain the parties' intent with regard to calculation of the final purchase price on the basis of commissions on new business *(see, Matter of Friedman,* 64 AD2d 70, 81, *supra; Janos v Peck,* 21 AD2d 529, 535, *affd* 15 NY2d 509; *see also, Gerhart v Disston & Sons,* 290 F2d 778, 784-785). Consideration of LUC's evidence of the parties' negotiations and of trade custom and usage in aid of interpretation is also fully sanctioned by modern authorities on the law of contracts *(see,* 3 Corbin, Contracts §§ 542, 543, 556, at 100-129, 130-155, 240-245; Restatement [Second] of Contracts § 214 [c]; § 220 [1979]).

Significantly here, Supreme Court, in addressing some of the facial incongruities above discussed, itself resolved them by resort to parol evidence contained in plaintiff's reply affidavit. However, LUC's contrary proof could not be ignored, and, thus, factual issues were created requiring a trial.

MAHONEY, P. J., KANE, CASEY and WEISS, JJ., concur.

Order reversed, on the law, with costs, and motion denied.