**In re OWENS CORNING, et al., Debtors in Possession.**

**No. 00–3837 JKF.**

United States Bankruptcy Court, D. Delaware.

April 9, 2003.

William DeStefano, Esq. and Risa B. Greene, Esq., Philadelphia, PA, for Owens Corning.

Richard J. Parks, Esq., MacDonald, Illig, Jones & Britton LLP, Erie, PA, Richard W. Epstein, Esq., Ekker, Kuster, McConnell & Epstein, LLP, Sharon, PA, for New York Packaging Corporation.

**Memorandum Opinion**

JUDITH K. FITZGERALD, Chief Judge.

This Memorandum Opinion constitutes the court's findings of fact and conclusions of law. The court's jurisdiction was not at issue.

Before the court is the request of New York Packaging Corporation (N.Y.PC) for payment of an administrative claim. The dispute is over the price term in the contract between the parties. Trial took place on January 21, 2003.

From the evidence adduced at trial, I find the facts as follows:

At all times relevant, NYPC was in the business of manufacturing plastic products including the plastic sheets at issue in this matter, which are 2 millimeters thick and 54 by 54 inches in size. From observation of one displayed at trial, it appears that each sheet is similar in appearance to the type of plastic sheet used to protect a carpet under a wheeled desk chair. Jeffrey Rabeia was the president and sole owner of NYPC. Debtors' Trumbull Asphalt Division was the only customer for which NYPC produced the type of plastic sheets involved in this dispute. The Trumbull Division had been a customer of NYPC's for at least six years. Debtors used the plastic sheets at their asphalt plants, including those in Atlanta, Jacksonville, Medina and six other locations. The sheets acted as dividers, separating asphalt containers so as to prevent them from sticking to one another. Typically, 60–pound containers were stacked on top of one another on pallets that weighed one ton each. Five plastic sheets were needed on each pallet. At that time the asphalt sold for less than $300 per ton.

Prior to the transaction in question, Debtors established that they dealt with NYPC as recently as 1999. In March and April, 1999, Debtors placed three orders with NYPC for this product, all at the price of 34.5 cents per sheet. Moreover, on February 15, 2001, one day after the Debtors obtained the quote that is now in dispute, Debtors obtained a quote for the same product through the Medina, Ohio, plant and, on February 20, 2001, placed an order.[1] The details of the Medina order,

that will be addressed below, are significant because NYPC denies that the Medina order followed the Jacksonville order and contends that the Medina order was placed before Jacksonville's.

Because of the lack of precision in predicting the exact amount of raw materials needed in the manufacturing process for the quantity of sheets ordered, the parties accepted a tolerance in the number of sheets furnished to Debtors. NYPC generally supplied more sheets than Debtors ordered and the evidence showed that the range of additional sheets was between 125 extra sheets for the Medina order in 2001 to 800 additional sheets for a shipment in April, 1999. In all of the dealings between the parties except that in dispute herein, NYPC quoted prices in units of 1000 sheets.

Debtors had a surplus of sheets at the Atlanta plant, from which other plants, including Jacksonville, drew supplies. In February 2001, Jacksonville needed sheets but Atlanta was in short supply and provided a reference to NYPC as a place where Jacksonville could purchase some. The transaction in question began on February 14, 2001, when Debtors received a quote for a new order of plastic sheets. Janet Berry, a customer service representative of Debtors in Jacksonville whose duties include placing orders such as this one, called for the quote and was told by an unidentified woman from NYPC that the price would be "$172.50 per box." Ms. Berry, who had never before dealt with NYPC, was also told that each box would contain 200 sheets. After receiving this information, Ms. Berry put the information into Debtors' "SAP" computer system,

---

**1.** I conditionally admitted evidence concerning this transaction, subject to striking it should I determine that it was not admissible parol evidence or that it was not relevant. Having reviewed all of the evidence, I now find that parol evidence is permitted to show the mistake in the contract and to nullify the legal effect of the error. Therefore, I overrule the objection, find the evidence to be relevant and admit it.

which, in turn, generated a purchase order. Ms. Berry mistakenly believed that the unit of measurement designated as "EA" on the purchase order was per box, when, in fact, it was per sheet. As a result, the purchase order likewise mistakenly reflected a price of $172.50 per sheet, rather than per box. Ms. Berry was not able to see the purchase order due to the vagaries of the "SAP" computer system which does not display the finished purchase order before it is faxed to the vendor. Although she could have printed the purchase order before it was faxed to NYPC, Ms. Berry did not do so, in accord with her customary practice. Based on the information in the system, the computer automatically calculated the price based on the unit of measurement and generated a purchase order reflecting a price of $1,078,195 for the plastic sheets, including shipping charges of $70. The document contains a "no oral modification" clause and states that it is an offer from the buyer (i.e., Debtors) to the seller (i.e., NYPC) that becomes binding when accepted by the seller.

Although there is no explanation for the month-long delay between February 14, 2001, when Ms. Berry set the SAP system in motion to automatically fax the purchase order to NYPC and March 15, 2001, when NYPC acknowledges having received it, the court finds that NYPC did not receive it until March 15, 2001. The document was faxed to NYPC on March 15 following a phone call the previous day, inquiring about the status of the order, during which NYPC indicated it had not received the February 14 order. However, on February 15, 2001, in an unrelated transaction to that at issue, NYPC was contacted by another of Debtors' representatives, John Nagle, from Debtors' plant in Medina, Ohio. Mr. Nagle was given a quote, also by an unidentified woman from NYPC, of 46.1 cents per sheet for 5000 sheets or 40.5 cents for 10,000 sheets. Debtors chose the 5000 sheet price and placed an order. NYPC actually delivered 5125 sheets to the Medina plant on March 5, 2001.

On March 15, 2001, NYPC received the disputed purchase order from the Debtor. The order asserted a requested delivery date which was the same date the order was issued—i.e., February 14, 2001—for 6,250 polypropylene sheets. Jeffrey Rabeia, NYPC's president and sole owner testified that NYPC mailed a confirmation of the purchase order to Debtors on March 16, 2001, confirming both the quantity and price. However, there was no record that such a confirmation had ever been received by Debtors. Moreover, NYPC's records do not contain a sales order acknowledgment for any other order placed by Debtors, including the Medina order, and the existence of this document in NYPC's files is inconsistent with NYPC's customary record keeping practices. Thus, I find that no confirmation was sent.

Pursuant to the order, NYPC shipped goods on April 3, 2001. Debtors accepted delivery of 8200 sheets of polyethylene, even though the order was for polypropylene sheets. NYPC invoiced the Debtors $1,414,605.60 for the 8200 sheets. Thus, both the price and the number of "overrun" sheets far exceeded any prior dealings between the parties and also far exceeded the quotation given for the same product by NYPC to the Medina plant the day after the quotation at issue.

Mr. Rabeia testified that the price quoted was actually in the amount of $172.50 per sheet. He stated that the extreme price increase was due to the fact that he filled the Medina order from stock on hand, that he had stopped manufacturing the product and had incurred unspecified and undocumented additional costs to redirect his plant back to making the product

ordered by Ms. Berry. He had no documents to establish the alleged costs. His only recollections were that he had to reassemble an extrusion line and that he incurred a cost for resin of about $75,000—$80,000. Mr. Rabeia testified that he had discussed the order and the price with Ms. Berry on February 22, 2001. He acknowledged that the price he quoted was not based on "any kind of calculation." Notes of Trial Testimony, January 21, 2003, page 18, lines 20—21. I believe Ms. Berry's testimony and find that the information about the price for the sheets was given to Ms. Berry by an unidentified woman, a practice that was consistent with the way NYPC provided the quotation to Medina, and not by Mr. Rabeia. Tellingly, NYPC's records contained written notations reflecting prices quoted to Debtors for every transaction except this one, an absence which is entirely unexplained by Mr. Rabeia.

Further, I discredit Mr. Rabeia's testimony concerning the disassembly of the extrusion line. He testified that he accepted the Medina order on February 20. Then, he stated that he told Ms. Berry on February 22, 2001, that his plant was not making the sheets any longer. Mr. Rabeia's testimony about the dates is not credible. The Jacksonville purchase order Ms. Berry prepared is clearly dated February 14. Thus, the documentary evidence, which I accept, shows that the price quotation at issue was given to Ms. Berry on February 14, 2001 and that NYPC accepted an order and shipped sheets ordered by the Medina plant after that date. The quantity shipped to Medina is also significant. Medina chose to order 5000 sheets and received 5125. However, NYPC had offered to sell Medina 10,000 sheets, as reflected in the prices quoted. Thus, NYPC had nearly the capacity to fill both the Medina order of 5000 sheets and the Jacksonville order of 6250 sheets, a total of 11,250 sheets, from its existing stock, particularly inasmuch as the parties always agreed to a tolerance in quantity. Accordingly, even if I were to accept Mr. Rabeia's testimony about the dates, which I do not, his statement that he told Ms. Berry on February 22 that NYPC was no longer making the plastic sheets and that he would have to retrofit the plant to produce the Jacksonville order despite existing capacity for at least 5000 of the 6250 sheets Jacksonville wanted strains credulity.

Moreover, NYPC delivered the product to Medina 18 days after it received the order and shipped the product to Jacksonville 18 days after it confirmed receipt of the order. There is no credible explanation of record as to how a plant that no longer made the product and had been disassembled could have been reassembled, acquired the raw materials necessary to make the plastic, completed the manufacturing process and shipped the finished product in approximately the same amount of time that it took to fill a similar order from existing stock. Mr. Rabeia's testimony about using existing stock to fill the Medina order was also inconsistent with his deposition testimony taken during discovery. I find Mr. Rabeia's testimony on this point to be wholly incredible.[2]

---

2. Further demonstration of the absurdity of NYPC's assertion that the price quoted was a per sheet price which Debtors accepted is shown by the fact that Debtors' asphalt sold for less than $300 per ton and that five sheets of plastic were used to separate stacked containers that total a ton. At the rate of $172.50 per sheet, using five sheets would have cost the Debtors $862.50 per ton of asphalt. Thus, for each ton sold, Debtors would have incurred a loss of over $562.50 just for the plastic sheets, without considering the cost of materials used in making asphalt and the cost of production and delivery.

Moreover, Debtors produced evidence of purchases of this product from other vendors

After several unsuccessful efforts to correct the error through telephone calls, on June 7, 2001, Debtors sent a letter to NYPC indicating that they would not pay the invoice and asking to have it corrected to reflect the quoted price of the sheets. NYPC refused to adjust the invoice and commenced this action for allowance and payment of an administrative expense. Eventually, after Order from this Court, Debtors paid $7154.89 to NYPC for the sheets. This amount represented the $172.50 per 200 sheets—an amount still more than double all prior prices between the parties—and shipping charges. The balance of the invoice is still in dispute.

I find that the contract price was a good faith error created by Ms. Berry when she put the information into Debtors' computer system and compounded by NYPC when, upon seeing the huge discrepancy in the price listed on the purchase order, a price that was based on a quotation NYPC had provided to Debtors, it failed to correct the situation.

The parties agree that New York law governs this transaction. NYPC accepted Debtors' purchase order at its place of business in New York and manufactured the goods there. The New York Commercial Code applies "[u]nless displaced by the particular provisions of this Act, the principles of law and equity, including . . . estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." N.Y.U.C.C. § 1–103 (McKinney 2002). Section 2–607 of the New York Commercial Code requires the buyer to pay, at the contract rate, for any goods accepted. As noted above, Debtors accepted the goods and did not pay the $1.4 million price stated on the purchase order.

I find that the purchase order contained an error in the price based upon a mistake of material fact. NYPC provided Ms. Berry with a price but Ms. Berry inadvertently produced a purchase order that did not conform the price term to the quotation. NYPC was or should have been aware of the error and had an opportunity to correct it when it received the purchase order that listed a price for 6250 sheets of $1,078,125 rather than a price of slightly over $7000. New York law permits rescission to correct errors such as this. *Middle East Banking Co. v. State Street Bank Intern.*, 821 F.2d 897 (2nd Cir.1987); *Assurance Co. v. Pulin*, 142 N.Y.S.2d 809, 810 (N.Y.App. Div.1 Department.1955) (per curiam) (rescission permitted in cases of unilateral mistake absent fraud when the mistake is one that is or should be known to the other party). The instant contract, however, is incapable of being rescinded since the goods were accepted and used by the Debtors after their offer to return the goods to NYPC was refused. Nonetheless, the error is so huge that it shocks the conscience of this court. Therefore, I further find that the contract must be reformed and the price must be modified to avoid an unconscionable result. Under New York law, a unilateral mistake, including a drafting error, may provide the basis for rescission or reformation of a contract or for other equitable relief. *See Broadway–111th Street Assocs. v. Morris*, 160 A.D.2d 182, 553 N.Y.S.2d 153, 155 (N.Y.App.Div. 1 Dept.1990); *Balaban–Gordon Co., Inc. v. Brighton Sewer District No. 2*, 41 A.D.2d 246, 342 N.Y.S.2d 435, 439 (N.Y.App. Div. 4 Dept.1973). This is especially so where enforcing the contract according to its terms would be unconscionable, even though the contract

during the period from March 31, 1999, through May 22, 2002. The prices quoted

ranged from a low of 34.5 cents per sheet to a high of 51 cents per sheet in that time.

does not, of itself, violate public policy. *See, e.g., Loyalty Life Insurance. Co. v. Fredenberg*, 214 A.D.2d 297, 632 N.Y.S.2d 901, 902–903 (N.Y.App. Div. 3 Dept.1995) (party will not be relieved of duty to abide by contract merely because it is burdensome absent unconscionable terms).

In this case, the price term in the contract was in error and, if left to stand, would lead to an unconscionable result. No reasonable man would have drafted this contract without laboring under a mistake as to the price and no honest and fair man would have accepted it as written. *See Matter of Friedman*, 64 A.D.2d 70, 407 N.Y.S.2d 999, 1008 (N.Y.App. Div. 2 Dept. 1978) (§ 2–302 codified the common law doctrine of unconscionability used to invalidate offensive contracts). NYPC discovered the error and did nothing to correct it. Thus, the contract having been performed and rescission being impossible, equity requires that the contract must be reformed to set a reasonable price and enforced as reformed. Case law in New York in the area of construction contract bids lends support to this remedy. In *Iversen Construction Corporation v. Palmyra–Macedon Central School District*, 143 Misc.2d 36, 539 N.Y.S.2d 858 (1989), the court addressed a mistaken bid price of nearly $800,000 less than the contractor intended, caused by a clerical error. The court stated that the law of New York makes it "very clear that under the circumstances of this case, it would be unconscionable to require Iversen to perform at the mistaken bid price." *Id.* at 860. Later, in discussing equitable reformation of a bid-contract, the court noted that there was little in New York's body of law addressing the concept. Looking to federal law and cases from other jurisdictions, the court decided that reformation of the contract was the appropriate equitable relief, citing *Dick Corporation v. Associated Electric Co-op., Inc.*, 475 F.Supp. 15 (E.D.Mo.) (a mistake must be of such consequence that enforcement would be unconscionable, relate to the substance of the consideration, have occurred regardless of the exercise of ordinary care, and the remedy must return the other party to the status quo). The clerical error was found to be a legitimate mistake, made without improper conduct, fraud or collusion, and through inadvertence despite the exercise of ordinary care in the procedure followed to submit the bid.

In the case at bench, the same can be said. Ms. Berry followed her customary procedures in preparing the computer generated purchase order and in faxing it to NYPC. There has been no contention that Ms. Berry acted in a fraudulent or improper manner. She simply did not correctly enter the data onto the purchase order form. The result was a material mistake in the contract. The first opportunity to correct the error came when NYPC received the order and noted the million dollar price tag. Rather than acting in a good faith fashion and informing the Debtors of this huge mistake, NYPC tried to turn the error to its own advantage, and to the disadvantage of every other creditor in this estate. Moreover, the reformation will not prejudice NYPC. In fact, it will put NYPC into a better position than it would have had if I applied any price per sheet quoted to the Debtors by NYPC or by any other supplier of plastic sheets.

I therefore reform the price term of the contract so that the unit of measurement is amended to read "per box" rather than "EA," the "Order Qty" is amended to read "41 boxes of 200 sheets per box" and the overall price is modified to read "$7,072.50 plus $70 shipping." The total price is therefore amended to be $7,142.50. Note that in making this change, I am including the over-run in the initial bid. Debtor paid $7154.89. I do not recall the reason for the discrepancy of $12.39. It may

represent accrued interest from the date I ordered the payment until the payment was made.

 Even were I inclined not to reform the price, I would not allow the $1,414,605.60 claimed by NYPC as an administrative expense under 11 U.S.C. § 503(b)(1)(A). The statute authorizes administrative expense priority for the "actual, necessary costs and expenses of preserving the estate." As noted in footnote 2, Debtors produced evidence of purchases of this product from other vendors during the period from March 31, 1999, through May 22, 2002. The prices quoted ranged from a low of 34.5 cents per sheet to a high of 51 cents per sheet in that time. Thus, a claim of over $1.4 million for 8200 plastic sheets used for the purposes articulated above, which could have been obtained from other vendors at substantially less expense, is anything but a necessary cost to this estate.

By allowing the reformed price as I have, I am requiring Debtors to pay 86.25 cents per sheet (i.e., 41 boxes at $172.50 per box of 200 sheets)—an amount significantly higher than any established price or value for this product. However, inasmuch as (1) Debtors' witness testified to this as the price she was quoted and created the error in the purchase order, (2) Debtors failed to ascertain the error prior to accepting delivery of the product, (3) although Debtors offered to return the product in early May, 2001, when the pricing error was discovered, NYPC refused to take it back, and (4) Debtors then utilized the product without rejecting it, I find the reformed price to be actual and necessary within the meaning of § 503.

Debtors having previously paid the sum of $7154.89, nothing further is owed.